# UNITED STATES DISTRICT COURT

### for the
### District of Alaska

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No. |
| | ) | |
| One metal, white dual wheeled trailer parked at the Ice | ) | |
| Park, with no license plates | ) | |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ District of _____ Alaska

*(identify the person or describe the property to be searched and give its location):*
One white, dual wheeled trailer parked at the Ice Park, with no license plates (See Attachment A)

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment B for Items to Be Searched for and Seized, incorporated herein by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before _March 19, 2011_
*(not to exceed 14 days)*

☐ in the daytime  6:00 a.m. to 10 p.m.        ☑ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge

_____
*(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐ for _____ days *(not to exceed 30).*
☐ until, the facts justifying, the later specific date of _____

Date and time issued: _March 10, 2011 at 11:30pm._        _____
                                                          *Judge's signature*

City and state: _Fairbanks, Alaska_        _Scott Oravec, U.S. Magistrate Judge_
                                           *Printed name and title*

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

| Inventory made in the presence of : |
|---|

| Inventory of the property taken and name of any person(s) seized: |
|---|
| |

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

# ATTACHMENT B - LIST OF ITEMS TO BE SEIZED

Agents may search for and seize the following:

1.     Any and all records, documents and materials pertaining to violations of (i) Title 18 U.S.C. § 371, Conspiracy, (ii) Title 26 U.S.C. § 5861(c), Possession of Firearms made in violation of Title 26, (iii) Title 26 U.S.C. § 5861(d), Possession of Unregistered Firearm, (iv) Title 26 U.S.C. § 5861(f), Making a Firearms in violation of Title 26 of the United States Code, (v) Possession of Firearm Without Serial Number, and Title 18 U.S.C. § 922(o); Possession of a Machine Gun, including but not limited to any such records, documents or materials pertaining to:

    a)     hand grenades, hand grenade casings, safety pins, spoons, ignitors, fuses or other components used in hand grenade making;

    b)     silencers, items utilized in the manufacture of silencers, including, but not limited to, metal casings or tubes, stainless steel or copper mesh, Vaseline, rubber gaskets, rubber tubing, other baffling or sound suppressing rubber, drills, drilled/holed pieces of metal, lathes;

    c)     unlicensed .30 caliber firearm;

    d)     Notes, writings, ledgers, papers, diaries, appointment books, calendars, maps, addresses or telephone lists, addresses, email address(es) and/or telephone numbers or other writings that reflect the name, or the search for the name of individuals known to law enforcement to be associated with Cox's state court cases, including, but not limited to Alaska State Troopers Lieutenant Ron Wall, Captain Burke Barrick, and Malik Jones, Superior Court Judge Michael McConahay and others associated with either law enforcement, prosecution, or the judicial system.

    e)     Any and all records, documents and materials pertaining to a search for the ownership and/or possession of any property owned by Alaska State Troopers Lieutenant Ron Wall, Captain Burke Barrick, and Malik Jones, Superior Court Judge Michael McConahay and others associated with either law enforcement, prosecution or the judicial system. including but limited to locations of, or the search for the location of business addresses, personal residences, recreational pieces of property and or other real or personal assets;

    f)     Any and all unregistered firearms and firearm paraphernalia - including but not limited to any firearms parts and components which could be used for converting semi-automatic firearms to fully automatic firearms;

    g)     Documentation regarding the ownership or purchase of unregistered firearms, explosive materials, components and other such materials;

h)  Explosive materials - including but not limited to: black powder, smokeless powder, flash powder, and any other material as listed in the Federal Register as explosive materials which could be utilized in a manner not consistent with their intended purpose;

i)  Destructive devices; and components to assemble a destructive device, including but not limited to: grenade casings or bodies, fuses, primers, primer caps, and or other type of chemical or electrical ignition devices for hand grenades;

j)  Ammunition, ammunition components for unlicensed firearms;

k)  Tools and materials for the modification of firearms to receive a silencer and/or the manufacture or modification of firearm silencers which includes but is not limited to metal pipe(ing), metallic baffles, metallic mesh, and a tap and die kit;

l)  Any "hit lists" or other items or documents used in the planning and gathering of intelligence from public or non-public sources for use in the planning of attacks on including, but not limited to Alaska State Troopers Lieutenant Ron Wall, Captain Burke Barrick, and Malik Jones, Superior Court Judge Michael McConahay and others associated with either law enforcement, prosecution or the judicial system including maps, drawings, action plans, surveillance notes of residences, work places and work schedules, vehicle descriptions, license plates, photographs same;

m)  Cell phones and gps units;

n)  Books, periodicals, training manuals or other publications or writings concerning the construction or use of a silencer/suppressor; the making of hand grenades or other explosive devices;

o)  Black electrical tape;

p)  threaded metal bolts of the size which can be used to plug the metal casing of a pineapple grenade

q)  solder, welding rods or other type of metallic items or equipment which could be used to plug the hole in a pineapple grenade casing.

# UNITED STATES DISTRICT COURT

for the

District of Alaska

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>One, white metal, dual wheeled trailer parked at the Ice<br>Park without license plates | )<br>)<br>)<br>)<br>)<br>)    Case No. |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):* visitors parking lot at the Ice Park 10 2011

One, white metal, dual wheeled trailer parked at the Ice Park without license plates

See Attachment A for Complete Description of Property to be Searched

located in the _____ District of _____ Alaska _____, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B for Items to Be Searched for and Seized, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 371 | Conspiracy |
| 26 USC 5861 (c),(d), (e),(f),(i) | Possession of Unregistered Destructive Devices |
| 18 U.S.C. 922(o) | Illegal Making, Transfer, Possession of Firearms, Possession of Machine Gun |

The application is based on these facts:

See Affidavit of Special Agent Patrick Westerhaus, FBI, attached hereto and incorporated as if fully set forth herein in its entirety.

☑ Continued on the attached sheet.

☐ Delayed notice of \_\_\_\_\_ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

PATRICK A. WESTERHAUS, SPECIAL AGENT

*Printed name and title*

Sworn to before me and signed in my presence.

Date: March 10, 2011

*Judge's signature*

City and state: Fairbanks, Alaska

Scott Oravec, U.S. Magistrate Judge

*Printed name and title*

# ATTACHMENT A

A white painted metal, dual wheeled utility trailer with an access door on the right side (facing the front), with a silver roof. The trailer has a logo on the front which says, "Cargo Mate," 1997-2007 Ten Years, with two racing flags between the words "Cargo" and "Matt" There is a dealer/seller sticker on the trailer, which states, "Loomis Lazy L Tack & Trailers, Mondovi, Wisconsin. There is also a model, serial and vin number on the vehicle, with the "#" being, CMN063476, Model Number CM820TA3, with a vin number of SNHUCMV228N)63476.

(See attached photographs Exhibits 1, 2, 3, 4 and 5)

It is requested that based on the facts and circumstances set forth above pertaining to law enforcement and public safety, as well as operation concerns that are factoring into the safe execution of this search warrant that permission be granted for a 24 hour search warrant with day or night service of the warrant be authorized. Every effort will be made to serve the warrant within the prescribed times of 6:00 a.m. and 10:00 p.m., but operational concerns may necessitate execution of the warrant before or after these times.



Exhibit 1, 2 of 2

Case 3:11-cv-00832-RJB   Document 219-1   Filed 01/13/12   Page 8 of 46



Exhibit 9 2 of 5



www.LazyL.com

EXHIBIT 1 5 of 5

# CMN063476

MODEL  CM820TA3

GVWR  9950  LBS

COUPLER  SIZE

2 5/16

V.I.N  5NHUCMV228N063476

Forest River, Inc.

# AFFIDAVIT IN SUPPORT OF APPLICATION FOR
## SEARCH WARRANT

I, Patrick A. Westerhaus, being duly sworn, state the following:

## I.     BACKGROUND AND EXPERIENCE OF AFFIANT

1.     As set forth herein, your affiant respectfully submits that there is probable cause to believe that, at the location described below, there exists evidence and instrumentalities of violations of federal criminal law, including, but not limited to, the following statutes: (i) Title 18 U.S.C. § 371, Conspiracy, (ii) Title 26 U.S.C. § 5861(c), Possession of Firearms made in violation of Title 26, (iii) Title 26 U.S.C. § 5861(d), Possession of Unregistered Firearms, (iv) Title 26 U.S.C. § 5861(f), Making a Firearm in violation of Title 26 of the United States Code, (v) Possession of Firearms Without Serial Number, and  Title 18 U.S.C. § 922(o), Possession of a Machine Gun.

2.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since March 2004.  I am assigned to the Joint Terrorism Task Force (JTTF) of the Anchorage Field Office.  I investigate domestic terrorism matters in the State of Alaska, as well as other violations of federal law.  I have training and experience in the enforcement of the laws of the United States, including the preparation and presentation of search warrant affidavits and in conducting searches pursuant to judicially authorized search warrants.

3.     I make this affidavit based upon personal knowledge derived from my participation in this investigation, upon my experience as an FBI agent, and upon information I believe to be reliable from sources including, among others, the following:  (i) oral and written reports about this and other investigations that I have either written or received from other law enforcement officers; (ii) physical surveillance which  has been reported to me or that I have participated in; (iii) public records; and (iv) consensual recordings, performed both in person and over the telephone during the

course of this investigation and which I have reviewed or have been provided information from those who have reviewed the recordings.

4.  This affidavit is submitted in support of a search warrant; it does not set forth each and every fact known to me or the other investigators about this investigation. Rather, this affidavit sets forth only those facts necessary to establish the requisite foundation for the requested warrant.

## II.  **LOCATION TO BE SEARCHED**

5.  **1618 Scenic Loop Fairbanks, Alaska 99709**

   **Schaeffer Cox's residence**

1618 Scenic Loop is described as follows:

A residential home located at approximately N 64 ° 52', 54.4" W 147° 48' 12.9." The property's physical description is Lot 1 Scenic Heights located in the 0902 Farmers Loop neighborhood. The parcel assessment number ("PAN") is 0253430 and it is approximately 39,820 square feet in size. Based on an aerial photograph, attached to this warrant application as Exhibit 1, the subject residence is a one level, brown, single family ranch home with a large two car garage. The two-car garage door is a faded red color, and the roof of the residence is a grey-ish white color. A short distance behind the house exists a two-door storage shed with trim in the same color as the garage door. The driveways on the residence are gravel, and the front of the house is cleared of trees save for decorative shrubs on the front lawn. Based on the facts of this affidavit, your affiant seeks permission to search both the residence, the storage shed and any other outbuildings located on the subject property.

-2-

6.     In my training and experience as an FBI Agent in seeking and executing numerous court ordered search warrants, I have learned that individuals who are involved in the possession of suppressors (also commonly known as silencers with both terms being used interchangeably herein), destructive devices (bombs, grenades and other similar devices) or want to acquire and maintain prohibited firearms, as defined below, often maintain in their residency instrumentalities of the crime illegal firearms and weaponry, ammunition for same, documents, notes, receipts, records, and other papers, related to these activities as well as information related to the purchase, acquisition, or modification of these firearms.

## III.    <u>RELEVANT STATUTES</u>

7.     This search warrant is being requested to obtain evidence of violations of (i) Title 18 U.S.C. § 371, Conspiracy, (ii) Title 26 U.S.C. § 5861(c), Possession of Firearms made in violation of Title 26, (iii) Title 26 U.S.C. § 5861(d), Possession of Unregistered Firearms, (iv) Title 26 U.S.C. § 5861(f), Making Firearms in violation of Title 26 of the United States Code, (v) Possession of Firearms Without Serial Number, and Title 18 U.S.C. § 922(o), Possession of a Machine Gun. The statutes listed above provide as follows:

Title 18 U.S.C. § 371, Conspiracy to Commit Offense Against the United States provides:

> that if two or more persons conspire to commit an act against the United States, or any agency thereof, and one or more of such persons does any act to effect the object of the conspiracy would be in violation of Section 371.

Title 26 U.S.C. § 5861, provides as follows, in pertinent parts:

> It shall be unlawful for any person -
> (b) to receive or possess a firearm transferred to him in violation of the provisions of this chapter; or
> (c) to receive or possess a firearm made in violation of the provisions of this chapter; or

-3-

(d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record; or
    (e) to transfer a firearm in violation of the provisions of this chapter; or
    (f) to make a firearm in violation of the provisions of this chapter, or
    (i) to receive or possess a firearm which is not identified by a serial number as required by chapter

For purposes of 26 U.S.C. § 5861, Title 26 U.S.C. § 5845(a)(6), (7), and (8) defines "firearm" to mean, respectively, a machine gun, any silencer, and a destructive device.

For purposes of 26 U.S.C. § 5861 and pursuant to 26 U.S.C. § 5845(a)(6) a "machine gun" is a "destructive device". Per 26 U.S.C. § 5845(b) The term "machine gun" is defined as follows: "The term "machine gun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the firearm or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machine gun, and any combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person.

Title 18 U.S.C. § 922(o), Possession of a Machine Gun, provides as follows:

(1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machine gun.

(2) This subsection does not apply with respect to—

(A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or
(B) any lawful transfer or lawful possession of a machine gun that was lawfully possessed before the date this subsection takes effect.

Pursuant to 26 U.S.C. § 5845 (f)(1) the term "destructive device means"...(1)(B) a grenade, and (3) "any combination of parts either designed or intended for use in converting any device into

-4-

a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled. Pursuant to Title 26 U.S.C. § 5845(a)(7) a "silencer" (as defined in Section 921 of title 18, United States Code) is a "destructive device". Under 18 U.S.C. § 921, a "silencer" is defined as: "the terms "firearms silencer" and "firearm muffler" mean any type of device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly of fabrication."

Under 26 U.S.C. § 5845(i) defines "make" as follows: "make, and the various derivatives of such word, shall include manufacturing (other than one qualified to engage in such business under this chapter), putting together, altering, any combination of these, or otherwise producing a firearm."

## IV. INVESTIGATION SUMMARY

### A. Confidential Sources CS-1 and CS-2

8. A Confidential Source, herein referred to as "CS-1," has reported information to the FBI, Anchorage Division, and the Alaska State Troopers for this investigation for approximately 10 months. During this time, CS-1's information, which was independently corroborated through various means, including but not limited to interviews of other persons, information provided by other Confidential Sources, and audio and video surveillance techniques, has proven to be both timely and accurate. Currently, CS-1 is a convicted felon, and is facing pending Alaska state felony fraud charges and is cooperating with law enforcement with the hope of having his charges reduced or dismissed by the State of Alaska in exchange for his cooperation. To date, CS-1 has been compensated and will be compensated in the future in connection with CS-1's cooperation. Save for those conversations listed specifically, the conversations listed in this affidavit involving CS-1 were

-5-

audio and or audio/video recorded. Throughout the course of this investigation, CS-1 has been unaware of the cooperation of CS-2 with this investigation.

9. A Confidential Source, herein referred to as "CS-2," has reported information to the FBI, Anchorage Division, for this investigation for approximately 10 months. During this time, CS-2's information, which was independently corroborated through various means, including but not limited to interviews of other persons, information provided by other Confidential Sources, and audio and video surveillance techniques, has proven to be both timely and accurate. CS-2 has no criminal record. CS-2 has been compensated and will be compensated in the future in connection with CS-2's cooperation. Save for those conversations listed specifically, the conversations listed in this affidavit involving CS-2 were audio and or audio/video recorded. Throughout the course of this investigation CS-2 has been unaware of the cooperation of CS-1 with this investigation.

## V.  INTRODUCTION AND BACKGROUND

### A.  Schaeffer Cox, Coleman Barney, and Lonnie Vernon's Membership With the Alaska Peacemaker Militia, and the Alaska Assembly Post

10. Fairbanks resident Schaeffer Cox ("Cox") is the self-described and functioning leader of the Alaska Peacemaker Militia and the self-described and functioning leader of the Alaska Assembly Post. The Alaska Assembly Post is a group of individuals who believe themselves sovereign citizens of the state and federal government. North Pole resident Coleman Barney ("Barney") and Salcha resident Lonnie Vernon ("Vernon") are also members of the Alaska Peacemaker Militia and the Alaska Assembly Post. Lonnie Vernon is an officer in the Alaska Peacemaker Militia as of August, 2010. CS-1 was promoted to officer status of the Command Staff of the Alaska Peacemaker Militia on or about February 3, 2011. Neither Cox, Barney nor Vernon

-6-

believe the state or federal government have any jurisdiction over their activities. It is their collective belief that at some undetermined point in the future they will have to take up arms against the government and or lead a revolution against the government by force of arms.

**B.      Schaeffer Cox, the Liberty Bell Network and Schaeffer Cox's Fugitive Status**

11.      Cox is also a founding member of the "Liberty Bell" network. The Liberty Bell network instructs its members or private citizens to call Liberty Bell members and report alleged civil rights violations being conducted by law enforcement. Liberty Bell network members then act as witnesses to any alleged civil rights violations.

12.      On or about March 17, 2010, Cox was called as a representative of the Liberty Bell network by a Fairbanks citizen who had interaction with the Fairbanks Police Department. Your affiant understands that upon arriving at the scene Cox failed to advise the Fairbanks Police Department officers he had a firearm concealed on his person as required by state law. Cox was charged with Misconduct Involving Weapons in the Fifth Degree in violation of AS 11.61.220. Cox was arraigned and given a trial date of February 14, 2011.

13.      On January 16, 2011, the Alaska Assembly Post held what was termed a "common law" court in Fairbanks, Alaska for the purpose of holding a common law trial on Cox's pending state charges. The common law court was presided over by "common law judge" and a "common law jury" was empaneled. At the conclusion of this common law trial Cox was acquitted of the states charges filed for which he was facing trial. The common law court also acquitted Cox of charges of reckless endangerment under AS 11.41.250, charges which Cox had plead guilty to in Alaska state court on March 5, 2010.

-7-

14. In February, with the trial date approaching, CS-1 advised that Cox held a meeting on or about February 12, 2011, with Barney and other members of the Command Staff of the Alaska Peacemaker Militia. Cox said that he was not going to appear in court. Two days later, on February 14, 2011, Cox failed to show for trial. Given the failure to appear, Superior Court Judge Michael McConahy issued a bench warrant for Cox's arrest. Cox has since been charged by the state with a class A misdemeanor for failing to appear under AS 11.56.730.

15. Prior to failing to appear, Cox moved his family from their residence on Scenic Loop Road to Vernon's residence at 10314 Old Valdez Trail in Salcha, Alaska. Cox and his family stayed at Vernon's residence until mid-February, 2011. Cox thereafter moved himself, his family, and belongings to Barney's residence at 2698 C Silver Street, North Pole, Alaska. Since departing his Scenic Loop Drive residence, Cox has had other members of the Alaska Peacemaker Militia, to include CS-1, enter his Scenic Loop Road home to get specific items.

## VI.   CONSPIRACY TO POSSESS HAND GRENADES, ACQUIRE HAND GRENADES, POSSESS SILENCERS AND ACQUIRE SILENCERS

### A.   Schaeffer Cox Tasks Vernon and CS-1 to Acquire Grenades and C-4 at a Militia Convention in Anchorage

16. In early February, 2011, Cox was slated to attend a statewide militia convention in Anchorage. Cox cancelled his attendance due to the birth of his child. Prior to Cox failing to appear in state superior court, and on or about February 4, 2011, Cox tasked Vernon and CS-1 to travel to Anchorage to attend the convention. Cox instructed Vernon and CS-1 to acquire as many pineapple hand grenades as the two of them could get. Cox also asked them to acquire "C-4" explosive. During the conversation about pineapple hand grenades Cox stated that he had pineapple grenades

-8-

with two second fuses. After Cox explained how he could make the pineapple grenades operational, Vernon stated that he knew from "cookbooks" that you could add phosphorous to the grenades. [1]

17.　From February 4th through February 6, 2011, and as directed by Cox, Vernon and CS-1 attended the militia convention in Anchorage. On or about February 5, 2011, and while at the convention, Vernon sought to acquire pineapple grenade bodies from CS-2, an individual known to Vernon as being in a position to possibly procure weaponry. CS-1 was present during the times Vernon met with CS-2.

18.　During the discussion with CS-2, Vernon also sought approximately 50 "fuses" from another individual known to Vernon for several years and who identified himself as the "fuse king." From the recorded conversation, it is clear to your affiant that the "fuses" discussion between Vernon and the "fuse king" was directed toward obtaining fuses to make hand grenades functional. The "fuse king" told Vernon he could not sell him 50 fuses as his supply was limited and the Bureau of Alcohol, Tobacco and Firearms ("ATF") had made the fuses possessed by the "fuse king" illegal. Vernon then stated that he was looking to obtain a few "pineapples" and make them useable. During the conversation Vernon also admitted that he has a fully automatic MP-5 machine gun that belongs to his wife. MP-5 machine guns, to the affiant's knowledge, are not made nor produced within the State of Alaska.

**C.　While Inquiring About Buying Grenades Vernon Inquires About a Obtaining a "Suppressor"**

---

[1]　"Pineapple" grenades are the iconic, World War II-era-and-later- grenades, with a cast iron casing. The casing includes deep grooves which are cast into the casing, giving it a pineapple-type appearance. Based on the facts of the investigation whenever the phrase "pineapple" is used it refers to a hand grenade.

### 1)   Vernon's Threats to Kill U.S. District Court Judge Ralph R. Beistline and Internal Revenue Service Officer Janice Stowell

19.   During the meeting about grenade bodies and fuses set forth in paragraphs 14 and 15, Vernon also asked CS-2 about whether CS-2 could obtain a "suppressor" for his (Vernon's) "Sig." The word "Sig" is known by your affiant to refer to a "Sig Sauer," a manufacturer of firearms. Vernon also expressed a desire to obtain a .50 caliber weapon. When asked by CS-2 about why he wanted a suppressor, Vernon stated to CS-2 that he had a reason and a spot for it. During this conversation with CS-2 Vernon made statements concerning his knowledge of attaching a suppressor to a firearm and he discussed the technical terms needed to make the silencer work with a particular firearm. Vernon later stated in the conversation with CS-2 that he had parts in his home from which he could make silencers himself.

20.   It is believed by your affiant that Vernon's intention to acquire a silencer is not Alaska Peacemaker Militia, nor Alaska Assembly Post related. It is known to your affiant that the Vernons are involved in U.S. District Court litigation with the Internal Revenue Service ("IRS"). By your affiant's reading of sections of the court file, the Vernons owe approximately $118,000 in back taxes to the IRS. On or about February 15, 2011, CS-1 advised that the Vernons received an envelope from the court in which the judge assigned, United States District Court Judge Ralph R. Beistline, informed the Vernons they had until March 7, 2011, to respond to a specific pleading filed by the United States or the judge will rule adversely in their case, which could result in a lien being placed on their home. Your affiant has read the order from the court and it corresponds to CS-1's reporting.

21.   During the conversation about the federal judge assigned to their case, Vernon said to Cox, and others words to the effect of that the judge would go down, that either way (meaning on

-10-

paper or otherwise) that he (Vernon) would win. Vernon continued and said he would hunt for the judge afterwards, and that the judge will have to hide. Vernon then said that everyday of his life the judge would be looking for that silencer to hit him in the back of his head. Vernon also said the judge is trying to play God over him and his family. At the time this statement was made Cox was still residing at the Vernon's residence with his wife and two small children, one being an infant. On that day, CS-1 had been invited by Vernon to Vernon's residence. Cox was there when CS-1 arrived. While at the residence, CS-1 noted numerous handguns, shotguns and assault rifles that were strategically placed at doors and windows. There were also several flak jackets and extra ammunition magazines strategically located. While there, CS-1 reported that Cox and Vernon talked about a militia weapons cache located on Chena Hot Springs Road.

22.     As mentioned above, from February 4th through February 6, 2011, Vernon and CS-1 attended a statewide militia convention in Anchorage. Vernon and CS-1 drove together both ways and while in the vehicle, CS-1 recorded his conversations with Vernon. Some of the conversations recorded while driving are audible, and some are not. While in the vehicle during this time frame, and on or about February 4, 2011, CS-1 advised that Vernon made statements about hunting district attorneys, their assistants, judges, and other law enforcement. Vernon said there is a Federal Judge named "Beistline" handling his case, and if the judge issues a summary judgment, he is "done." CS-1 took "done" to mean "kill." Vernon also voiced his displeasure with the IRS female Revenue Officer whom your affiant believes was working the IRS investigation against Vernon. As part of the investigation, your affiant has confirmed that the IRS Revenue Officer mentioned by Vernon is a Revenue Officer named Janice Stowell who works in Fairbanks. During this conversation, Vernon referred to Stowell as "this little bitch," and proceeded to tell CS-1 that "if you ever hear that name

-11-

put a bullet in it." Vernon also said that "this is when all this shit was starting with the IRS. I was going to kill the son of a bitch. I was going to do it and take three others."

23. On or about February 6, 2011, CS-1 advised that Vernon continued to discuss killing Judge Beistline. Vernon said that he knew about Judge Beistline's family, as well as where some of them lived. Vernon said he knew the location of Judge Beistline's cabin. Vernon used words to suggest that he intended to kill the judge, and his family along with other relatives if a summary judgment order is granted in the government's favor. Vernon said that he has identified the name and residence of the IRS Revenue Officer who has his case, and he continued to use words that suggests a desire to kill the IRS Revenue Officer as well. Vernon also said he has designed his house as an ambush site and added that if "the feds" show up he would do harm to them.

24. On February 17, 2011, a two count indictment was returned by the federal grand jury for the district of Alaska against Vernon. Count 1 charged Vernon with a violation of 18 U.S.C. § 115(a)(1)(A), Threatening to Murder Family Member of Federal Judge, Count 2 charged Vernon with a violation of 18 U.S.C. § 115(a)(1)(B), Threatening to Murder Federal Judge. Because Vernon continues to pursue the acquisition of a suppressor, a violation of 26 U.S.C. § 5861(d), and has made continuing threats against Revenue Officer Stowell which translates into additional charges under 18 U.S.C. § 115(a)(1)(B), the investigation into that crime, which includes this application and affidavit, is ongoing.

25. On or about February 21, 2011, CS-1 advised that he told Vernon that the individual whom Vernon previously met while in Anchorage in early February, CS-2, could provide a silencer that Vernon could customize. CS-1 asked Vernon if he still wanted the silencer. Vernon responded that he was still interested in the silencer but said he is "hard up" for cash. Vernon said he would

-12-

scrape the money together or trade for the silencer.

26.     On or about February 25, 2011, Vernon informed CS-1, while CS-1 was working with Vernon at a construction site, that he would shoot any law enforcement officer on sight that stops him without determining the reason for the interaction. Vernon also told CS-1 that he had the money in hand and is ready to purchase the suppressor. Vernon also stated that he planned to use the suppressor to kill the receptionist at the IRS, and then proceed to the office of the IRS Revenue Officer and kill her. As recently as last week, Vernon also told CS-1 that he wants hand grenades to use against law enforcement officers. This conversation was not recorded.

   **2)   Cox With a Target List, Cox and Barney Making Silencers, Ordering Gun/Silencer Matched Set, Possessing and Storing Hand Grenades and Ordering More Hand Grenades**

27.     On or about February 12, 2011, CS-1 advised that Cox held a meeting that included the Command Staff of the Alaska Peacemaker Militia, Barney and another militia members. Cox said that he was not going to appear in court on the following Monday, February 14, 2011, for a scheduled appearance regarding the State of Alaska misdemeanor charge that stemmed from the incident discussed in paragraphs 11, 12 and 13 of this affidavit. Cox then began to discuss what the others should do if he (Cox) were captured. The other militia members and Cox described a plan that they termed "1-4-1." The term was explained to mean "one for one," i.e., one law enforcement officer or judge would be killed for every militia member captured. After further discussion, Cox modified "1-4-1" to a term of "2-4-1." The phrase "2-4-1" was described by Cox to mean that in the event of his capture, or if any of the militia members are captured, they will capture or kill two people in return. As shown below, Cox and his associates referred specifically to the capture or killing at some undetermined point in time, of any police officers, judges, or district attorneys who

-13-

are involved in Cox's state court case.

28.     Cox said that he has gathered a list of the addresses for the state district attorneys in the Fairbanks, Alaska area. Cox said that he knows where State of Alaska Judge McConahy lives and that he would have no problem kicking in the judge's door and shooting him twice in the head. Cox stated that he had the legal and the moral authority to act in this manner to keep people from committing a felony against him, but also said he was not ready to act just yet.

29.     Later that evening, Cox asked CS-1 to meet him (Cox) at Cox's residence. Cox told CS-1 that another individual known to the investigation, and an associate of Cox, had the full target list which ostensibly identified all of the police officers, district attorneys, and state judges in the Fairbanks, Alaska area. Cox said that his associate can find anything on anyone. Cox gave CS-1 a phone number for his associate and told the CS-1 to get the list from him. Cox told CS-1 that the associate is compiling detailed information on police officers and judges which your affiant has learned includes photographic surveillance, residence locations and other personal information. Throughout the investigation Cox has led conversations with militia members about killing the individuals on the list.

30.     Cox, utilizing a map, showed CS-1 where Lieutenant Ron Wall and Captain Burke Barrick of the Alaska State Troopers live. Cox also advised that a state judge and an Alaska State Trooper live several houses down from Cox. As CS-1 was leaving the meeting with Cox, Cox gave him a note with an address and the name of a Trooper on it. Cox said that this Trooper was causing problems for "patriots" and needed to be on the list. The note was provided to the FBI, and the name on the note was that of Alaska State Trooper, Malik Jones, an individual known to the investigation to be with the Alaska State Troopers in Fairbanks.

-14-

31.     Throughout the course of the investigation Vernon and Cox have referenced the location of several self-described "militia weapons caches." On or about February 17, 2011, Vernon told CS-1 that the militia has a weapons cache on Chena Hot Springs Road. Vernon has told CS-1 that several militia caches exist around the Fairbanks area and added that Barney also knows where a particular cache is. Both Vernon and his spouse told CS-1 that Cox has a personal weapons cache at a property he (Cox) owns off of Bradway Road in Fairbanks, Alaska.

32.     On or about February 20, 2011, CS-1, Cox and Barney went to Cox's property on Traci Road. Traci Road is located off of Bradway Road in North Pole, Alaska. Cox has tenants on this property and collects rent. Once at the residence, Cox directed Barney and CS-1 to a storage shed located on the property while he (Cox) went inside to speak with the occupants. Barney, in so many words, asked Cox if the key was in the same place. Cox replied in the affirmative. Barney retrieved the key and opened the lock on the shed. While CS-1 and Barney were unloading the shed, Cox went inside the residence to collect rent.

33.     Once inside the shed, Barney and CS-1 removed firearms and other items. In one ammunition can CS-1 observed eight (8) "pineapple" grenades. While moving the box to Barney's vehicle CS-1 was able to view, count and identify eight (8) "pineapple" grenades, including observing that the safety pins and "spoons" of the grenade, (essentially a handle like the length of metal that parallels the grenade body) were wrapped in several layers of black electrical tape. CS-1 also observed that one of the grenades had a hole in the bottom of the grenade casing. CS-1 noted that as to this particular grenade that the hole was filled with some type of metal, effectively plugging the hole and making the casing intact. Your affiant knows, from experience and training, that pineapple grenade casings can be sold on the open market and that each have a hole through the

-15-

bottom of the casing. This hole prevents refilling of the grenade and acts to render the casing inoperable as a weapon. It is also known to your affiant

that materials commonly exist and are available which can act as a material sufficiently strong to plug the hole through the bottom of the casing.

34.     CS-1 also observed a .50 caliber weapon being removed from the shed. CS-1 could not determine if the .50 caliber weapon was fully automatic or not.

35.     After Barney's vehicle was loaded with the items from the shed, including the grenades and a .50 caliber weapon, Cox left with Barney. CS-1 left on his own. Two days later, on or about February 22, 2010, CS-1 met with Barney at Barney's residence. During that meeting, CS-1 learned from Barney that he and Cox had an uneventful trip from the Traci Road location to Barney's property. Both men discussed the prospect of being pulled over or stopped by law enforcement or sliding off the road and needing help with the type of cargo they were carrying. It is your affiant's opinion that Barney and CS-1 were speaking about the potential consequences of contacting law enforcement with the items taken from the Traci Road property being carried in Barney's vehicle. During this meeting, Barney asked CS-1 if he had heard the rumor that eight (8) hand grenades were missing from Ft. Wainright, and that popular belief held that Cox had them. Barney went on to say that eight (8) hand grenades weren't all that much unless you were one of the judges or district attorneys the group was looking at.

36.     While Cox was on the Traci Road property the tenant called the Alaska State Troopers to advise that Cox and two others were on the property removing things from a shed. This reporting independently corroborates reporting of the movement of items from Cox's property by CS-1.

-16-

37.     During the same meeting, on or about February 22, 2011, Cox, Barney and CS-1 undertook to program, activate and coordinate several cell phones which the men discussed would to be used to communicate with one another and which, they believed, would be untraceable by law enforcement. During a meeting that lasted for several hours, Cox mentioned "hand grenades" on two occasions. The first occasion came during a conversation when Cox joked about sending an "Easter Basket" to a specific individual. Cox, in a joking manner, stated they should send this individual an Easter Basket containing eight (8) grenades. This is the identical number of hand grenades observed by CS-1 in the ammunition can the night CS-1 removed the grenades from Cox's storage shed. The second mention of hand grenades occurred during a general discussion in the same meeting. Cox used words to the effect of "I can get hand grenades." Later in the conversation Cox joked about "killing the wrong judge" or the wrong person.

38.     Prior to CS-1 observing the eight (8) hand grenades on or about February 20, 2011, Cox made other statements about hand grenades. On February 12, 2011, and in a meeting with CS-1, Barney and another militia associate, Cox mentioned pineapple grenades and stated that he would like to get grenades with eight (8) second fuses. Cox also stated that he wanted powder for the grenades that was stronger than what he currently had. Cox stated that they had two (2) second fuses on his grenades.

39.     On or about February 27, 2011, CS-1 went to Barney's residence and met with Cox and Barney. CS-1 and Cox discussed smuggling Cox and his family out of Alaska through Canada by semi-tractor trailer.

40.     During this same February 27th meeting, CS-1 told Cox and Barney that he (CS-1) had heard from Vernon that Cox and Barney were interested in getting silencers. Barney stated they

-17-

were, and that Vernon was the one who was getting them.

41.     CS-1 told Barney that he (CS-1), not Vernon, was in the process of getting them and that he was getting them from CS-2, the same individual they both met in Anchorage at the militia convention.  CS-1 indicated that Vernon had ordered a silencer, but that Vernon didn't trust the individual, CS-2, from whom CS-1 was attempting to purchase the silencer from.  CS-1 told Cox and Barney that Vernon had ordered a silencer, and wanted CS-1 to pick it up from his supplier, CS-2. (CS-2 is the same individual Vernon spoke with in regard to pineapple grenades and ordering a "suppressor").  CS-1 then said to Barney and Cox that he would take it (the suppressor) if Vernon wouldn't.  Cox then replied that he (CS-1) would not get stuck with a silencer as they are easy to move and are in high demand.

42.     In furthering the conversation, CS-1 stated he needed the caliber and the barrel twist of what gun Cox and Barney wanted the silencer for.  In response, Cox stated he would like a matched set.  Barney stated that as to his weapon he would have to change barrels with what he had at present.  Cox then advised, while demonstrating with a Glock pistol, that a suppressor would not work on that specific type of Glock pistol he possessed.  Cox then inquired as to how fast CS-1's source could get the sale arranged.

43.     Cox then conducted a verbal tutorial on how to make homemade .22 silencers. With Barney present, Cox explained in detail the process of how to build a suppressor for a .22 caliber weapon which included an explanation on how to use a PVC pipe and plug, Vaseline, a dummy silencer cylinder, drilled holes, a washing machine hose, and a rubber nickel-sized device. Cox then talked about how it functioned to suppress the shot, and that his worked for approximately two magazines before the noise became louder. Cox mentioned that he and Barney had made, or were

-18-

going to make "How to" DVD's on how to make a silencer.

44.     Cox then talked about another method to silence a firearm by using a silencer filled with gel-shaving cream. Cox and CS-1 then talked about the cost of a Springfield XD 9mm with a silencer. CS-1 stated that his contact could do a "two-for one" pistol-silencer set and the total cost would be approximately $1,000. Cox agreed, and asked CS-1 to have his source acquire the matched set.

45.     After Cox and CS-1 agreed on a $1,000 purchase price, CS-1 stated he did not have that type of money currently available. CS-1, Cox, and Barney talked about automatic weapons. Cox offered CS-1 his HK-93. Cox explained he had all the components to make the HK-93 fire in a full-automatic mode. Cox said that he had the lower receiver for the HK-93, but that it required a little modification. Cox explained how to modify the lower receiver to make it attach to the body of the HK-93 which would then make it fully automatic. Cox stated that he'd be willing to take a reduction in the price since it was for the cause. Cox stated the HK-93 was in his name, and he filled out an ATF form for it.

46.     Cox then suggested he could give the HK-93 semi-automatic with a full-automatic lower-receiver unit to CS-1 if CS-1 gets the matched set pistol/silencer as the price would be about the same. CS-1 agreed with Cox's proposition.

47.     After that conversation, Barney asked CS-1 for a matched set pistol/silencer as well. CS-1 agreed. Barney then added he (Barney) was looking at doing paint ball training this summer. Barney, Cox and CS-1 then discussed the merits of paint ball and air-soft guns for training. By this conversation your affiant believes "training" means training for conflict with the government. Barney stated it would be good, realistic practice. Cox elaborated that he thought a good training

-19-

program would be to assign a target "around town" and either use one of these guns, or squirt guns. By this conversation your affiant understands the "around town" training would be a "mock attack" on a particular figure or member for the purposes of simulating an actual attack. After further discussing Cox's pending travel to Canada, Cox told CS-1 to acquire the best system CS-1's source (known to Cox as CS-2) could obtain and requested that the silencer be factory packed to silence 100 rounds.

48.    Barney then discussed how silencers would work to isolate sounds from a gun. Cox then made a reference to the silencers that he showed Barney the day before. All three men then discussed silencer construction and the materials that went into them, including steel wool, and tubing.

49.    Toward the end of the meeting, Cox directed CS-1 to look in his Scenic Loop Road residence for his wife's bullet proof vest and a grenade launcher tube. Barney than asked CS-1 when he would next speak with his contact. Cox then asked CS-1 if his source, CS-2, could overnight what Cox described as a "box of goodies." Cox expressed hope that the matched sets would not take too long to arrive.

50.    On or about March 1, 2011, CS-1 again met with Cox. By this time, CS-1 had picked up the HK-93 rifle, as authorized by Cox, to act as a trade weapon for the matched gun and suppressor set. During the meeting Cox stated that he could wait until next week for a trucker to arrive to covertly take Cox and his family to the lower 48. Cox stated that he is excited that the suppressor and pistol will arrive before he departs Alaska.[2]

_____

[2]    The trucker is a fabrication provided by the investigation to be relayed to Cox. Cox agreed to the concept of being smuggled out of Alaska to Montana by the fictitious trucker. His family would have accompanied him on the trip.

-20-

51.     During the conversation CS-1 stated he saw CS-2, who is selling the pistol/silencer combination to Cox and Barney, speak about "pineapples" to other individuals whom your affiant believes, based on the investigation, Cox trusts. Cox and CS-1 discussed purchasing other grenades from CS-2 and the cost per grenade. The figure of $100 per grenade was provided by CS-1. Cox thought that $100 figure was too expensive, but then reconsidered. Cox gave CS-1 a breakdown of the cost of a grenade, which came to be, in Cox's words, about $45 per grenade. Cox's figures included the costs of black powder and threaded bolts which Cox explained were put in the holes of the grenade casing.

52.     With respect to grenades, Cox mentioned and discussed that his grenades were with black powder and had "two (2) second fuses," such as those referenced herein. Cox stated he wished to purchase more grenades from CS-2, the same source as is supplying CS-1 with the suppressor/gun matched set for Cox and Barney. Cox asked if the grenades that were for sale were "eight (8) second fuses" and the possibility of a volume discount was discussed. Cox stated if they could get the price down to $70 per grenade he could buy as much as he wanted. If the price was below $40 per grenade Cox insinuated he would "stock up" and stated words to the effect of "how often do you get those?" CS-1 stated that his source, CS-2, was going to bring 25 grenades to Fairbanks, and Cox inquired how much CS-1's source wanted for the 25 grenades. Final terms as to purchase price or numbers to be purchased were not finalized during this meeting.

53.     On or about March 5, 2010, Cox met with CS-1. CS-1 informed Cox that he could obtain 8 grenades at a specific price. Cox replied he was under the impression he would be receiving 25 grenades. Cox nevertheless agreed to purchase the eight (8) hand grenades and thought the price was reasonable. Cox also stated that once he got his family transported out of Alaska he was going

-21-

to return to Alaska to wage guerilla warfare.

54.     As of this date of this affidavit, Vernon, Cox and Barney have agreed to purchase silencers from CS-1, who has informed Vernon, Cox and Barney that he is obtaining the silencers (and in Cox and Barney's case) a matched set of pistol and silencer, from CS-2, the same individual that Vernon and CS-1 approached at the militia convention in Anchorage in early February, 2011. Additionally, Vernon and Barney are aware that Cox is to receive eight (8) hand grenades from CS-2, via CS-1, at the same time as the pistol and silencer transaction. Vernon has told CS-1 that he possesses the cash necessary to complete the transaction. Cox has already given the HK-93 to CS-1 in trade for the matched set of a pistol and silencer. The transfer of the pistol/silencers and hand grenades to Cox, Barney and the sale of a silencer to Vernon is set to respectively occur on March 10, 2011.

55.     It is known to your affiant, based on conversation by Cox, that Cox possesses an automatic weapon. Cox informed CS-1 that he converted the weapon to fully automatic himself, and that he will not sell it as it has "sentimental value."

56.     On or about March 4, 2011, Vernon expressed to CS-1 that he wished to obtain some of the grenades from CS-2. Vernon and his spouse offered and discussed trading Vernon's spouse's jewelry for the grenades.

57.     A search of the National Firearms Registration and Transfer Records database revealed negative results for any firearms registered in the names of Cox, Barney and Vernon, and Vernon's spouse, from the year 2005 to present.

## VII.   CONCLUSION

58.     Based on the information provided in this affidavit, I respectfully submit that there

-22-

is probable cause to search the above listed location for evidence of, fruits of, and instrumentalities

of violations of (i) Title 18 U.S.C. § 371, Conspiracy, (ii) Title 26 U.S.C.

§ 5861(c), Possession of Firearm made in violation of Title 26, (iii) Title 26 U.S.C. § 5861(d),

Possession of Unregistered Firearm, (iv) Title 26 U.S.C. § 5861(f), Making a Firearm in violation

of Title 26 of the United States Code, (v) Possession of Firearm Without Serial Number, and Title

18 U.S.C. § 922(o) (Possession of a Machine Gun).

59.     Your affiant knows from the investigation in this case that Cox and his spouse are

residing in the Barney residence. Cox has two young children, an infant, approximately two months

old, and a two year old child. Barney and his spouse also have four (4) small children who are also

residing in the home and his wife is approximately eight (8) months pregnant. Your affiant knows

that Cox has a bullet proof vest, as does his spouse.

60.     On March 10, 2011, law enforcement officers executed search warrants on the

residents of Lonnie Vernon, Schaeffer Cox, and Coleman Barney. With respect to these search

warrants, investigators did not locate a white, dual wheeled utility trailer listed in Attachment A of

this search warrant, and attachment A of the prior warrant issued in this case for the Barney

residence..

61.     On this date, both Schaeffer Cox and Coleman Barney were taken into custody

pursuant to arrest warrants issued by the State of Alaska. The arrests occurred after Cox and Barney

received a pair of handgun/silencer combinations, and a box of 8 inert hand grenades that were

delivered by CS-1.

62.     At approximately 12:50 pm, Barney was taken into custody and brought to the

Fairbanks Police Department. While in custody, Barney was asked by law enforcement if he wanted

-23-

to cooperate after his advice of rights (Miranda warning) was read and throughly explained to him by your affiant. Barney said he wanted to cooperate with law enforcement but he wanted to first speak to a lawyer. All questioning ceased, save for communications with Barney about finding him counsel. For the next several hours law enforcement attempted to contact a lawyer that Barney wished to speak with. All means were exhausted by law enforcement to contact and find Barney's attorney, but the efforts failed. Investigators then provided Barney with approximately three to four names and telephone numbers of criminal defense lawyers in Fairbanks that are both trained to handle State and federal matters. Barney stated that he still wished to find the particular lawyer that he knew to represent him, but he still was still interested in cooperating with law enforcement. Barney was then transported from the Fairbanks Police Department to the Fairbanks Correctional Center ("FCC") by United States Marshal Randy Coyne.

63.    During this time, law enforcement investigators continued to search for the dual wheeled white trailer listed in Attachment A.   During the course of the investigation, Barney's spouse Rachel Barney was interviewed. During the interview, Rachel Barney told investigators that the white trailer belonged to her husband, and that both her husband, and Schaeffer Cox moved the trailer off the Barney property the morning of March 10, 2011. Rachel Barney then stated that her husband and Cox went to a field trip with one of the Barney's children to the "Ice Park" this morning (March 10, 2011). Rachel Barney said that when her husband and Cox left the property they had the white utility trailer described in Attachment A in tow. Your affiant is aware that the "Ice Park" is a public facility where ice sculptures are visible for the public to view and where additional family oriented activities take place. The "Ice Park" is located at 1925 Chena Landings Loop Fairbanks, AK. The white dual trailer is currently sitting on the east side of the parking lot, with the front of the

-24-

trailer facing south. Or in another description, it is sitting in the back of the parking lot to the immediate left after you pull into the main parking ingress and egress route. The white utility trailer, as of the date of this affidavit, is currently the only trailer located in the "Ice Park" parking lot.

64.    It is known to the investigation that Cox and Barney drove a black Dodge pickup truck, license number DTZ 206,  to meet with CS-1 in order to purchase the handgun/silencer combinations and eight (8) grenades. The investigation has revealed that this truck is registered to Barney. The bed of the aforementioned pickup truck, which your affiant knows is owned by Barney, was filled with birch wood logs. Although not visible in the photographs provided as attachments to this affidavit, there is a round birch log similar in size to those present in the back of Barney's black colored truck supporting the trailer hitch of the white utility trailer. In addition, there were no Alaska State license plates visible on the white utility trailer.

65.    On the way to the Fairbanks jail, and due to the fact that law enforcement could not locate the trailer, U.S. Marshal Coyne, during transport of Barney from the Fairbanks Police Department to FCC, asked Barney as to the location of the white utility trailer. This question was posed to Barney, despite his invocation to his right to counsel, due to the exigency of not knowing the location of the trailer and due to public and law enforcement safety concerns, which stems from your affiant's belief, based on the events chronicled in paragraph 33 of this affidavit, that the white utility trailer contained hand grenades, silencers, possible automatic weapons and ammunition. Barney responded that the trailer was located at the "Ice Park." Barney also admitted that there were inert grenades in the vehicle.

66.    On this same matter, Cox, who agreed to cooperate and was debriefed by law enforcement officers, informed law enforcement that he knew the location of the trailer.  Law

-25-

enforcement asked Cox if the trailer was located at the "Ice Park" and he admitted that it was, and it was located at the "Ice Park." Cox admitted there were weapons, to include a .30 caliber Gatling-gun type machine gun, and a Browning .30 caliber chain fed firearm inside the trailer as well as other personal belongings.

-26-

PATRICK A. WESTERHAUS
Special Agent, FBI

Subscribed and sworn before me this 10th of March 2011.

UNITED STATES MAGISTRATE JUDGE

-27-

## ATTACHMENT A

A white painted metal, dual wheeled utility trailer with an access door on the right side (facing the front), with a silver roof. The trailer has a logo on the front which says, "Cargo Mate," 1997-2007 Ten Years, with two racing flags between the words "Cargo" and "Matt" There is a dealer/seller sticker on the trailer, which states, "Loomis Lazy L Tack & Trailers, Mondovi, Wisconsin. There is also a model, serial and vin number on the vehicle, with the "#" being, CMN063476, Model Number CM820TA3, with a vin number of SNHUCMV228N)63476.

(See attached photographs Exhibits 1, 2, 3, 4 and 5)

It is requested that based on the facts and circumstances set forth above pertaining to law enforcement and public safety, as well as operation concerns that are factoring into the safe execution of this search warrant that permission be granted for a 24 hour search warrant with day or night service of the warrant be authorized. Every effort will be made to serve the warrant within the prescribed times of 6:00 a.m. and 10:00 p.m., but operational concerns may necessitate execution of the warrant before or after these times.

## VI.    <u>ATTACHMENT B - LIST OF ITEMS TO BE SEIZED</u>

Agents may search for and seize the following:

1.     Any and all records, documents and materials pertaining to violations of (i) Title 18 U.S.C. § 371, Conspiracy, (ii) Title 26 U.S.C. § 5861(c), Possession of Firearms made in violation of Title 26, (iii) Title 26 U.S.C. § 5861(d), Possession of Unregistered Firearm, (iv) Title 26 U.S.C. § 5861(f), Making a Firearms in violation of Title 26 of the United States Code, (v) Possession of Firearm Without Serial Number, and Title 18 U.S.C. § 922(o); Possession of a Machine Gun, including but not limited to any such records, documents or materials pertaining to:

    a)     hand grenades, hand grenade casings, safety pins, spoons, ignitors, fuses or other components used in hand grenade making;

    b)     silencers, items utilized in the manufacture of silencers, including, but not limited to, metal casings or tubes, stainless steel or copper mesh, Vaseline, rubber gaskets, rubber tubing, other baffling or sound suppressing rubber, drills, drilled/holed pieces of metal, lathes;

    c)     unlicensed .50 caliber firearm;

    d)     Notes, writings, ledgers, papers, diaries, appointment books, calendars, maps, addresses or telephone lists, addresses, email address(es) and/or telephone numbers or other writings that reflect the name, or the search for the name of individuals known to law enforcement to be associated with Cox's state court cases, including, but not limited to Alaska State Troopers Lieutenant Ron Wall, Captain Burke Barrick, and Malik Jones, Superior Court Judge Michael McConahay and others associated with either law enforcement, prosecution, or the judicial system.

    e)     Any and all records, documents and materials pertaining to a search for the ownership and/or possession of any property owned by Alaska State Troopers Lieutenant Ron Wall, Captain Burke Barrick, and Malik Jones, Superior Court Judge Michael McConahay and others associated with either law enforcement, prosecution or the judicial system. including but limited to locations of, or the search for the location of business addresses, personal residences, recreational pieces of property and or other real or personal assets;

    f)     Any and all unregistered firearms and firearm paraphernalia - including but not limited to any firearms parts and components which could be used for converting semi-automatic firearms to fully automatic firearms;

    g)     Documentation regarding the ownership or purchase of unregistered firearms,

explosive materials, components and other such materials;

h)  Explosive materials - including but not limited to: black powder, smokeless powder, flash powder, and any other material as listed in the Federal Register as explosive materials which could be utilized in a manner not consistent with their intended purpose;

i)  Destructive devices; and components to assemble a destructive device, including but not limited to: grenade casings or bodies, fuses, primers, primer caps, and other type of chemical or electrical ignition devices for hand grenades;

j)  Ammunition, ammunition components for unlicensed firearms;

k)  Tools and materials for the modification of firearms to receive a silencer and/or the manufacture or modification of firearm silencers which includes but is not limited to metal pipe(ing), metallic baffles, metallic mesh, and a tap and die kit;

l)  Any "hit lists" or other items or documents used in the planning and gathering of intelligence from public or non-public sources for use in the planning of attacks on including, but not limited to Alaska State Troopers Lieutenant Ron Wall, Captain Burke Barrick, and Malik Jones, Superior Court Judge Michael McConahay and others associated with either law enforcement, prosecution or the judicial system including maps, drawings, action plans, surveillance notes of residences, work places and work schedules, vehicle descriptions, license plates, photographs same;

m)  Cell phones and  gps units;

n)  Books, periodicals, training manuals or other publications or writings concerning the construction or use of a silencer/suppressor; the making of hand grenades or other explosive devices;

o)  Black electrical tape;

p)  threaded metal bolts of the size which can be used to plug the metal casing of a pineapple grenade

q)  solder, welding rods or other type of metallic items or equipment which could be used to plug the hole in a pineapple grenade casing.

-29-

-30-

KAREN L. LOEFFLER
United States Attorney

STEVEN E. SKROCKI
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: steven.skrocki@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ) | Case No. |
| One white metal, dual wheeled trailer parked o the Ice Fair visitors parking lot at the without license plates ) | **MOTION TO SEAL SEARCH WARRANT, APPLICATION, AFFIDAVIT FOR SEARCH WARRANT, AND RETURN** |
| ) | **FILED UNDER SEAL AND ON SHORTENED TIME** |

COMES NOW the United States of America, by and through the United

States Attorney for the District of Alaska, and moves this Court to seal the search

warrant, application, affidavit for search warrant, and return in the matter of the

search of (insert property to be searched).

Historically, courts have recognized a "general right to inspect and copy public records and documents, including judicial records and documents." Kamakana v. City and County of Honolulu, 447 F.3d 1172, 1178 (9th Cir. 2006) *citing* Nixon v. Warner Communications, Inc., 435 U.S. 589, 597 & n.7, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). Nonetheless, access to judicial records is not absolute. A narrow range of documents is not subject to the right of public access at all because the records have "traditionally been kept secret for important policy reasons." Id. *Citing* Times Mirror Co. V. United States, 873 F.2d 1210, 1219 (9th Cir. 1989). Ninth Circuit case law has identified two categories of documents that fall into this category: grand jury transcripts and warrant materials in the midst of a pre-indictment investigation. Id. Parties seeking to seal a judicial record not traditionally kept secret must provide compelling reasons to the court for doing so. Id. In general, "compelling reasons" are those sufficient to outweigh the public's interest in disclosure. Id. at 1179.

THEREFORE the United States moves for an order sealing the Search Warrant, Application and Affidavit and Returns for the Search Warrant issues in the above-captioned matter until further order of this Court. The government makes this motion to protect the investigative integrity of the present case. The investigation of this case is ongoing and disclosure of the issuance off the search

2

warrant could result in destruction of evidence and could also impact officer and / or witness safety.

The basis for this motion is that the matter under investigation is a long term investigation the disclosure of which could imperil law enforcement and undercover cooperating witnesses. Additionally, the matter at present is of the type that involved long term intelligence collection of a sensitive nature. Disclosure of this search warrant, and the affidavit thereof, would greatly place at risk investigators, cooperating witnesses and would result in the destruction of evidence as well as sensitive investigative techniques. Officers with the Federal Bureau of Investigation are involved in numerous covert contacts relating to the individuals using this address. Officers and or cooperating individuals are still actively involved in transactions and contacts with these individual. If information relating to this investigation were made public, evidence would likely be lost, ongoing contacts would be terminated and officer and witness safety would be compromised.

Based on the foregoing, the government respectfully requests that this Court enter the attached order sealing said Search Warrant, Application and Affidavit for Search Warrant, the returns and this motion and order until said time that the

3

investigation is completed. At which time, the government will move the court by appropriate pleading seeking to unseal the Search Warrant and accompanying documents, as well as the return.

RESPECTFULLY SUBMITTED this 10th day of March, 2011, in Anchorage, Alaska.

KAREN L. LOEFFLER
United States Attorney

s/ Steven E. Skrocki
STEVEN E. SKROCKI
Assistant U.S. Attorney
222 West 7th Ave., #9, Rm. 253
Anchorage, AK 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: steven.skrocki@usdoj.gov

4