MICHAEL FILIPOVIC
Federal Defender
ANN WAGNER
Assistant Federal Defender
Attorneys for Francis Schaeffer Cox
FEDERAL PUBLIC DEFENDER FOR THE
WESTERN DISTRICT OF WASHINGTON
1601 5th Avenue, Suite 700
Seattle, Washington 98101
Phone: (206) 553-1100
Fax: (206) 553-0120
Email: Michael_Filipovic@fd.org
        Ann_Wagner@fd.org

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| FRANCIS SCHAEFFER COX, | ) No. 3:11-cr-00022-RJB |
| | ) |
| Petitioner, | ) MOTION FOR WRIT OF AUDITA |
| | ) QUERELA PURSUANT TO ALL |
| v. | ) WRITS ACT, 28 U.S.C. § 1651 |
| | ) |
| UNITED STATES OF AMERICA, | ) **ORAL ARGUMENT REQUESTED** |
| | ) |
| Respondent. | ) |
| | ) |

**INTRODUCTION**

Francis Schaeffer Cox, by and through his counsel, moves this Court for a writ

of *audita querela* pursuant to the All Writs Act, 28 U.S.C. § 1651, granting a new trial

on Count 12 of his former judgment, conspiracy to murder federal officers or

employees. According to the Ninth Circuit, "the writ of *audita querela* can only be

available where there is a *legal* objection to a conviction, which has arisen subsequent

to that conviction, and which is not redressable pursuant to another post-conviction

remedy." *Doe v. I.N.S.*, 120 F.3d 200, 204 (9th Cir. 1997) (quoting *United States v. Holder*, 936 F.2d 1, 5 (1st Cir. 1991)) (emphasis in original).[1] Such a legal objection arose in Mr. Cox's case when the Ninth Circuit vacated Count 16 of the judgment, solicitation of others to engage in the murder of an officer or employee of the United States, on jurisdictional grounds—specifically, "because the federal 'hit team' that the security team was supposed to guard against [at the television station KJNP] did not exist." Mem. Op. at 4.

That jurisdictional holding, in turn, cracked the foundation of the jury's verdict on the conspiracy count. While the government had argued three theories of liability for the conspiracy count, the one it particularly emphasized in closing and rebuttal argument was "conspiracy to kill federal employees or federal officers *at KJNP*." Dkt. 647 at 39 (emphasis added); Dkt. 646 at 106–07. And defense counsel responded to this emphasis by focusing on that theory. *See* Dkt. 646 at 143 (Defense counsel: "Let's talk about KJNP on November 23rd, 2010, since this is the basis of the government's charge of conspiracy to commit murder in . . . Count 12…."). Although the Ninth Circuit held in the same memorandum opinion that there was *sufficient evidence* of federal jurisdiction to submit the conspiracy count to a jury on a separate theory of liability that received comparatively little attention in closing arguments, an examination of the general verdict form for the conspiracy count does not reveal which theory or theories the jury relied on to convict. Based on the arguments of the government and defense counsel, which both emphasized the KJNP theory, it is highly

---

[1] A motion for writ of audita querela is filed with the sentencing court. *Harris v. United States*, No. C09-1041-JLR, 2009 WL 2957811, at *1 (W.D. Wash. Sept. 14, 2009) (citing 28 U.S.C. § 1651(a); *United States v. Monreal*, 301 F.3d 1127, 1131 (9th Cir. 2002); *Madigan v. Wells*, 224 F.2d 577, 578 n.2 (9th Cir. 1955)).

likely that the jury relied on a theory that, as a matter of law, cannot give rise to federal jurisdiction. A new trial is therefore necessary to cure the jurisdictional defect.

## FACTS AND PROCEDURAL HISTORY

### A.   Evidence at Trial

The government premised its prosecution of Francis Schaeffer Cox for first-degree murder conspiracy of federal employees on three independent theories of liability—but it relied most heavily on the "fictitious federal assassins" theory that, according to the Ninth Circuit, lacked federal jurisdiction. Mem. Op. at 4 (alterations and quotation marks omitted) (citing *Feola v. United States*, 420 U.S. 671, 695–96 (1975)).

The third superseding indictment alleged, as overt acts supporting the conspiracy to murder federal officers or employees and the solicitation to murder count, that Mr. Cox and his co-defendants developed a security plan, including the use of firearms, for Cox's appearance on Fairbanks' KJNP-TV, based on his belief that a "wholly fictitious . . . hit team" of federal agents was trying to assassinate him. Dkt. 239 at 7–8. Despite being labeled an "overt act" in the indictment, this theory eventually came to predominate over the other two theories of liability, presumably because it was the only theory in which there was an unambiguous agreement, and the "targets" were unmistakably "federal," albeit only in Cox's imagination. *See* 18 U.S.C. §§ 1117, 1114 (referring to conspiracies to kill "any officer or employee of the United States"). In a second theory, on which the Ninth Circuit based its sufficiency holding, Mr. Cox and Mike Anderson agreed to create a database of 12–15 state employees. They discussed using the database in the event of the collapse of the present government and the ensuing imposition of "Stalinesque" martial law, characterized by mass arrests and purges, in order to identify and resist the persons carrying out such unlawful acts. *See* Dkt. 629 at 57–59, 194. Although Mr. Cox asked Mr. Anderson to add three federal

employees he knew of to that database (namely, Nanette Curtis, Tom Studler, and Trina

Beauchamp), Mr. Anderson wrote their names on a notepad, did not add them to his

computer database, and did no research on them. *Id.* at 114–16. And in the third theory,

known as 2-4-1, Cox and others engaged in a hypothetical discussion, renounced prior

to any agreement, about arresting two state employees if one of his group were arrested,

or killing two state employees if one of them were killed. *See* Gov't Ex. 14T (Appendix

1 at 87–88.) No federal employees were mentioned as targets. *Id.* at 71–120.

       Before trial, the government responded to a motion for a bill of particulars as to

Counts 12 and 16 by identifying the targeted victims as:

- Unspecified federal agents whom Cox believed were looking to kill him;

- Unspecified federal agents who might have drawn weapons on Cox, his wife, or a "Judge" David Bartels[2] on November 23, 1010, the date of the KJNP television appearance;

- Based on discovery, "Curtis female DHS, border control," and "Tom Stedler DHS," and "Trina Bowkamp"; and

- Based on discovery, Deputy U.S. Marshal James "Jimmy" Johnson.

Dkt. 269 at 3–4. Two out of four of those responses refer to the fictitious federal

assassin team that the Ninth Circuit held lacked federal jurisdiction. The evidence at

trial further showed there could not have been an agreement to murder the marshal

Jimmy Johnson, because Cox did not know of him or anything about him. *See* Dkt. 629

at 171; 190–91. The only remaining group of alleged federal targets, under the Ninth

Circuit's holding, were the three federal employees whom Mr. Cox had asked

Mr. Anderson to add to his database. Of course, Mr. Anderson had testified he never

added them to the database, nor did any research on them, and it is difficult (though, per

the Ninth Circuit, not irrational) to discern any agreement between Mr. Cox and

---

[2] The "common law" Judge Bartels is not a state, local, or federal employee.

MOTION FOR A WRIT OF AUDITA QUERELA
(*Francis Schaeffer Cox*, CR11-022-RJB) - 4

Mr. Anderson to commit first-degree murder of those employees. The alternative fictitious-federal-assassins theory was therefore key to Mr. Cox's conviction on the conspiracy count.

The nature of the trial testimony about KJNP was also inherently prejudicial in a way that is difficult to cure. In addition to presenting the facts, testimony about KJNP went to the premeditation and malice aforethought elements of a first-degree murder conspiracy. In opening statements, the prosecution characterized the self-defense plan as an automatic resort to lethal violence. *See* Dkt. 625 at 21 ("You'll see at the bottom of that dry erase board they were given two ways to deal with federal interference. First option, Hornet's Nest, OC gas. Second option, lead poisoning."). J.R. Olsen then testified as follows:

> Q: With respect to the security detail, there was discussion about killing federal law enforcement?
> A: Yes.
> Q: And being prepared to do that?
> A: Yes. [Cox]—he said, 'You need to be prepared to kill them and stomp them through the ice if you have to.'

Dkt. 632 at 130. Neither the prosecution nor Mr. Olsen clarified that Mr. Cox had been referring to the fictional federal assassin team at this point. Mr. Cox was also cross-examined in a highly prejudicial manner about his characterization of the (fictional) federal assassins as "soulless":

> Q: And while your private army was outside guarding, guarding you, securing the perimeter, you were inside, on TV, telling people that soulless—federal soulless assassins were out to kill you. Right?
> A: I would have said that different, but nothing that you said is technically inaccurate.
> Q: And all of that was okay because you were living by your own set of rule[s]. Right?
> MR. DOOLEY: Objection. Argumentative.
> THE COURT: I think he may answer.

THE WITNESS: There is one set of rules that is universally
applicable to all mankind. And I live by that.
Q: You don't live by federal statutes. Right?
A: Whenever they do not come into conflict with right and wrong, I
comply.

Dkt. 641 at 215–16. The Ninth Circuit ultimately vindicated Mr. Cox on this point: He
did not violate a federal statute during the KJNP episode, and his efforts to defend
himself against what he sincerely believed to be a hit team bent on assassinating him
were based on a mistaken factual premise, not a desire to flout the law. But the
prosecution's cross examination would have made it difficult for the jurors to put KJNP
out of their minds while considering the conspiracy count.

    The government chose to emphasize KJNP in closing as support for the
conspiracy count. The turning point in the investigation, the prosecutor argued to the
jury, was when, "for the first time—we hear about this assassination team. Right?"
Dkt. 646 at 52. Paraphrasing Mr. Cox, Mr. Skrocki elaborated, "'We've got this six-
member assassination team from Aurora, Colorado. They're coming to get me.'" *Id.*

    This theory continued to dominate the next ten pages of transcript as the basis
for both the solicitation and conspiracy counts. *Id.* at 52–61. Mr. Skrocki argued that
Mr. Cox's fear of the assassination team supplied a motive for Mr. Cox's alleged
agreement to murder those (fictional) federal employees. *Id.* at 53. Without
acknowledging the self-defense context that was critical to understanding the KJNP
episode, Mr. Skrocki argued misleadingly, "Cox is telling his people—we've got it on
recording from Olson—that anybody who's on this detail has to be prepared to kill.
Right? So I want you to think about that for just a minute. You walk into somebody's
house, and somebody says, you know, 'We're going to have this meeting, and when
you leave, and you go protecting someplace, *you've got to pull the trigger and kill
somebody*.'" *Id.* at 55 (emphasis added). About another security detail, he suggested
that Mr. Cox's "citizen vigilantes . . . were going to open up on people who might be

plainclothes federal agents." *Id.* at 57. He argued that a member of the militia was subject to "orders [that] 'You see a federal agent, plainclothes, you—and he draws down, you kill him.' That's what his directions were." *Id.* at 59. Venturing beyond even the tenuous "fictional federal assassin" theory of federal jurisdiction that was eventually overturned on appeal, Mr. Skrocki suggested that the jury convict based on abstract danger to the public:

> What is one going to do when you're faced with a plainclothes law enforcement officer and your instructions are, as the whiteboard says, "Draw down." That person draws down. Are you going to say, "Are you a trooper?" Are you going to say, "Are you a fed?" How are you going to tell? The board makes absolutely no sense in the real world. The axiom is "No plan survives contact with the opposition," period. That's what would have happened in this case.
>
> [. . . .]
>
> Can you imagine if you a plainclothes trooper—sorry. If a plainclothes trooper went in there and didn't get the memo, seeing these people out there with semiautomatics—go to the next slide please—and that's Mr. Cox's. One more. And they didn't get the memo, what's their first instinct going to be? They're going to pull, like, "What's going on?" Right? "No one told me about this." And the board—the most important piece of that board is that it doesn't say "Do not shoot unless they shoot first." That'd be the easy one to put down there. But that's not what it says. We have "Draw down."

*Id.* at 57–58, 61. When he summarized the evidence supporting the conspiracy conviction, he led with one acronym: "KJNP." *Id.* at 107.

Additional, inflammatory use of evidence about the KJNP episode continued during the solicitation argument, when Mr. Skrocki repeatedly paraphrased Mr. Cox as having sought "guys who are willing to stomp these assassins through the ice." *Id.* at 125.

The argument of the alleged conspirators similarly focused on the KJNP episode. Ms. Haden stated in her argument on behalf of Lonnie Vernon that "the issue here is, as

MOTION FOR A WRIT OF AUDITA QUERELA
(*Francis Schaeffer Cox*, CR11-022-RJB) - 7

charged in the indictment, whether there was a conspiracy, a conspiracy to murder federal officials, those being the fictitious FBI agents that Francis Schaeffer Cox thought were after him." *Id.* at 174; *see also id.* at 167–68 ("[T]his case is mainly about Francis Schaeffer Cox and his inability to distinguish between reality and his own fiction."). Mr. Dooley argued that *only* KJNP could have given rise to liability for Coleman Barney, stating, without objection, that he was unaware of Mr. Anderson's database and that "2-4-1 stuff . . . . is not charged as a crime. It's one of the four weeks of trial out of the five weeks that doesn't pertain to these weapons charges and murder charges." *Id.* at 157. Mr. Cox's attorney, Mr. Traverso, then argued, "Let's talk about KJNP on November 23rd, 2010, since this is the basis of the government's charge of conspiracy to commit murder in . . . Count 12." *Id.* at 143.

Finally, the government's rebuttal argument dwelled on the facts related to KJNP, Dkt. 647 at 17–18, and summed up the argument to convict on the conspiracy count as follows: "The evidence is overwhelming in terms of . . . *conspiracy to kill federal employees or federal officers at KJNP*." *Id.* at 39. Although the government also discussed Mr. Anderson's database, it was not the focus of the government's argument. Mr. Skrocki also mentioned the 2-4-1 discussion, but conceded the evidence showed "people going back and forth" and never arguing it amounted to an "agreement." In rebuttal, he mentioned it only to argue that "there's no 2-4-1 entrapment." *Id.* at 9.

Ultimately, the trial transcript shows that without the fictitious federal assassins theory, it is highly unlikely that Mr. Cox would have been convicted of conspiracy to murder federal officers or employees.

## B. Procedural History

Counsel for Mr. Cox and for other alleged coconspirators moved for a judgment of acquittal on the murder conspiracy count at the close of the government's evidence. *See* Dkt. 638 at 11–15, 47–50.

MOTION FOR A WRIT OF AUDITA QUERELA
(*Francis Schaeffer Cox*, CR11-022-RJB) - 8

In a discussion with the prosecution, the court expressed concern regarding fictional-federal-assassin basis for the conspiracy count. AER 75. This Court worried,

> Well, here's the thing, that I guess is a little troubling to me. There were no federal agents that we know of. There might as well have been little green men from Mars. And so if it's—is the existence of federal agents or the likelihood of federal agents coming to arrest Mr. Cox—is that a condition precedent that has to be met here with some evidence in order to get to a conspiracy . . . that's realistic—you know, realistic conspiracy?

Dkt. 597 at 31–32.

This Court ultimately denied the motion, finding these are "arguments that can properly be made to the jury," and allowing the government to proceed on all three theories of liability for the conspiracy count. Dkt. 638 at 29.

At the close of evidence, counsel for Mr. Vernon and Mr. Barney renewed their motions for acquittal, relying on their earlier arguments. The court summarily denied the motions. Dkt. 645 at 78. Mr. Cox did not formally renew his motion to acquit.

On appeal, the Ninth Circuit overturned the solicitation conviction, agreeing with Mr. Cox that *Feola* deprived the federal courts of jurisdiction over an alleged request to murder fictional federal entities: "[B]ecause the federal 'hit team' that the security team was supposed to guard against did not exist, the solicitation to murder a member of that hit team did not 'constitute[ ] a sufficient threat to the safety of a federal officer so as to give rise to federal jurisdiction.'" Mem. Op. at 4 (quoting *Feola*, 420 U.S. at 695–96). In response to Cox's self-defense arguments, the Ninth Circuit also agreed for the purposes of solicitation liability that none of the circumstances surrounding the security detail "'strongly confirm[ed] that [D]efendant actually intended' for anyone to commit first-degree murder." *Id.* (quoting *United States v. Stewart*, 420 F.3d 1007, 1020–21 (9th Cir. 2005)).

Although the fictitious federal assassins also played a primary role in the evidence the jury was asked to consider for the conspiracy count, the Ninth Circuit

nonetheless upheld the conspiracy conviction. Mem. Op. at 3. Assuming without deciding that Cox was entitled to de novo review, the Ninth Circuit held that the evidence was sufficient to warrant submission to a jury where "[d]efendant and his co-conspirators agreed to attack government officials—including federal officers—in the event of certain conditions that they subjectively thought were likely to occur." *Id.* The court further held that "[a] rational trier of fact could also conclude that 'the agreement, standing alone, constituted a sufficient threat to the safety of a federal officer so as to give rise to federal jurisdiction.'" *Id.* (quoting *Feola*, 420 U.S. at 695). The Ninth Circuit then remanding to this Court for resentencing without the solicitation conviction. *Id.* at 6.

Cox then filed a petition for rehearing with suggestion for rehearing en banc, which was denied. *See* COA Dkt. 162. He also filed a petition for certiorari in the Supreme Court, which was also denied. *See* SCOTUS Case No. 17-8074. Resentencing on counts other than solicitation is currently scheduled for May 30, 2019, in this Court at Tacoma, Washington.

## LEGAL ANALYSIS

The writ of *audita querela* is one of several common law writs for postjudgment relief that were abolished in the civil context when Rule 60(b) of the Federal Rules of Civil Procedure was adopted in 1946, but which survive in the criminal context. *See* Brian R. Means, 1 Postconviction Remedies § 5:11 at 208–09 (Thompson Reuters 2018). The writ of *audita querela* is available "where there is a *legal* objection to a conviction, which has arisen subsequent to that conviction, and which is not redressable pursuant to another post-conviction remedy." *Doe*, 120 F.3d at 204 (internal quotation marks and citation omitted).

As the Ninth Circuit has further explained, the basis for the writ's continued viability in the federal criminal context is "the Supreme Court's decision in *United*

*States v. Morgan*, 346 U.S. 502, 74 S. Ct. 247, 98 L. Ed. 248 (1954) and the All Writs Act." *United States v. Valdez-Pacheco*, 237 F.3d 1077, 1079 (9th Cir. 2001) (citing *Doe*, 120 F.3d at 203; 28 U.S.C. § 1651(a)). In *Morgan*, the Supreme Court held that the writ of *coram nobis* in criminal cases survived the adoption of Federal Rule of Civil Procedure 60(b) because such a motion is part of the original criminal case, not a separate civil proceeding. *Morgan*, 346 U.S. at 505–06 n.4. The same is true of the writ of *audita querela*. "*Morgan* stands for the proposition that the common law writs, such as *coram nobis* and *audita querela*, are available to 'fill the interstices of the federal postconviction remedial framework.'" *Valdez-Pacheco*, 237 F.3d at 1079 (citing *Doe*, 120 F.3d at 203 (quoting *United States v. Ayala*, 894 F.2d 425, 428 (D.C.Cir.1990)). Naturally, the writ of *audita querela* is not available where a challenge is possible under § 2255 or another posttrial motion, because then "there is no 'gap' to fill in the postconviction remedies." *Id.* at 1080.

This is one of the rare occasions where the writ of *audita querela* is not only appropriate, but necessary.

## A. The Objection to Mr. Cox's Conspiracy Conviction Is Legal, Not Equitable

The primary reason courts have *denied* motions for the writ of *audita querela* in recent years is that the objections lodged by petitioners were equitable rather than legal. For example, the petitioner in *Doe* asked for his drug conviction to be vacated to prevent his deportation, in light of his substantial cooperation with the DEA and the risk that he would be killed or physically injured if he were returned to Mexico. *Doe*, 120 F.3d at 202. The Ninth Circuit reversed the district court's grant of the petition even as it recognized that "the equities are compelling," *id.* at 202, because "the writ of *audita querela* may not issue to vacate Doe's conviction on solely equitable grounds." *Id.* at

205. Doe had no legal basis for objecting to the conviction itself, but only the unjust consequences he was suffering.

On the other hand, the writ was recently granted by two courts unable to deliver relief based on a controlling legal decision in any other manner. A state court granted the writ to acknowledge the belated impact of *Lawrence v. Texas*, 538 U.S. 558 (2003), striking down state sodomy laws. That petitioner successfully sought to have his "homosexual acts" conviction expunged although it could no longer be attacked through normal routes of review. *See* Tony Gonzalez, *How Nashville Man Cleared of 'Homosexual Acts' Conviction Paves The Way*, NPR (Nov. 16, 2016), https://www.npr.org/2016/11/16/502208745/how-nashville-man-cleared-of-homosexual-acts-conviction-paves-the-way. In another case, the Third Circuit anticipated that relief would be granted, and the district court on remand accordingly granted the writ and ordered resentencing, where a prison weapons conviction no longer qualified as a crime of violence for the purpose of the career offender guideline under on-point circuit law following *Begay v. United States*, 553 U.S. 137 (2008), but that claim was not cognizable under § 2255. *United States v. Kenney*, No. 4:99-CR-0280, 2017 WL 621238, at *5 (M.D. Pa. Feb. 15, 2017).

Mr. Cox points to an essentially legal problem with his conspiracy conviction. It is unknown—and unknowable—whether his jury found the jurisdictional element of his conspiracy conviction to be met based on a sound theory of federal jurisdiction. *Cf. Yates v. United States*, 354 U.S. 298, 312 (1957), *overruled on other grounds by Burks v. United States*, 437 U.S. 1 (1978) (holding that a general verdict on a conspiracy charge had to be set aside—either to grant a new trial or direct a motion of acquittal—where the verdict is supportable as to one object of the conspiracy, but not on another, and it is impossible to tell which ground the jury selected). Prior to the abolition of the civil writ of *audita querela*, the writ was used in cases where the defect in the judgment

was jurisdictional but the defect was not discovered until after the judgment. *See, e.g.*, *New River Mineral Co. v. Seeley*, 120 F. 193, 200 (4th Cir. 1903). The jurisdictional defect made apparent by the Ninth Circuit's opinion is essentially legal in nature and can be the basis for granting the writ of *audita querela*.

## B. The Objection Arose Subsequent to the Conviction

Here, the jurisdictional defect in the conspiracy conviction was not evident at the time of the conviction: Neither the Ninth Circuit nor the Supreme Court had previously held whether an alleged plan to kill *fictional* federal assassins could give rise to the federal jurisdiction in a prosecution under 18 U.S.C. §§ 1117 and 1114, and the jury was thus permitted to consider that theory as a basis for Mr. Cox's conspiracy conviction. *See* Jury Instructions, Dkt. 430 at 51–52; Gov't Closing Argument, Dkt. 647 at 39; Dkt. 646 at 106–07. The conspiracy verdict was therefore facially valid when entered, but has been undermined by a new legal development. *See Doe*, 120 F.3d at 203 (quoting *Ayala*, 894 F.2d at 429 (quoting 3 W. Blackstone, Commentaries at *405–06) ("Commentators and jurists since the time of Blackstone have emphasized the need to show a postjudgment contingency supplying a 'matter of discharge' or 'defense.'")); Leff, *The Leff Dictionary of Law: A Fragment*, 94 Yale L.J. 1855, 2101 (1985) ("[A] writ issued to afford a remedy to a defendant against whom judgment had been rendered, but who had a new matter in defense (*e.g.*, a release) arising, or at least raisable for the first time, after judgment."); *see also New River Mineral Co.*, 120 F. at 196 ("[P]roceedings for vacating [the judgment] . . . tak[e] the place of the old writ of audita querela, which was invented, says Blackstone, 'lest in any case there should be an oppressive defect of justice, where a party who hath a good defence is too late to make it in the ordinary forms of law.'") (quoting 2 William Blackstone, Commentary on the Laws of England 320 (1830)).

When the Ninth Circuit vacated the separate solicitation conviction, which was based solely on the fictional federal assassin theory, the legal objection to the conspiracy conviction arose. Importantly, this objection is separate from and more modest than Mr. Cox's challenge to the sufficiency of the evidence on the conspiracy conviction before the Ninth Circuit. The sufficiency challenge, had it succeeded, would have prohibited retrial on the conspiracy count. *See McDaniel v. Brown*, 558 U.S. 120, 131 (2010) (citing *Lockhart v. Nelson*, 488 U.S. 33, 39 (1988); *Burks v. United States*, 437 U.S. 1, 18 (1978)). The Ninth Circuit rejected that argument: it held that sufficient evidence and jurisdiction existed as to the theory that Cox and Mike Anderson "agreed to attack government officials—including federal officers—in the event of certain conditions that they subjectively thought were likely to occur." Mem. Op. at 3 (referring to Anderson's testimony that they created the database of government employees in the event that "Stalinesque" martial law, characterized by unconstitutional "mass arrests [and] purges," were being carried out by such employees (Dkt. 629 at 57–60, 63)). Because Mr. Cox's appeal had been premised on the sufficiency of the evidence for both the solicitation and conspiracy counts, rather than another legal premise, he did not ask for a new trial in his opening brief as a remedy for the jurisdictional defect in the conspiracy count. Indeed, a new trial became the appropriate remedy for the jurisdictional defect in the conspiracy conviction only after the Ninth Circuit vacated the solicitation judgment while upholding the sufficiency of the evidence on conspiracy.

### C. The Jurisdictional Defect Is Not Redressable Pursuant to Another Post-Conviction Remedy and the Writ Is Necessary to Fill a Gap

The writ is unavailable to Mr. Cox if the defect is redressable under another postconviction remedy, such as § 2255. *United States v. Valdez-Pacheco*, 237 F.3d 1077, 1080 (9th Cir. 2001) ("We agree with our sister circuits and conclude that a

federal prisoner may not challenge a conviction or sentence by way of a petition for a writ of *audita querela* when that challenge is cognizable under § 2255 because, in such a case, there is no 'gap' to fill in the postconviction remedies."). Section 2255 is not available to Mr. Cox because he has not yet been resentenced.[3] *See United States v. LaFromboise*, 427 F.3d 680, 686 (9th Cir. 2005), as amended, No. 03-35853, 2005 WL 3312694 (9th Cir. Dec. 8, 2005) ("Until the district court enters an amended judgment of conviction, LaFromboise's § 2255 motion is in fact premature, rather than untimely."). The text of § 2255 supports the conclusion that § 2255 relief is unavailable to Mr. Cox: "A prisoner in custody *under sentence* of a court . . . may move the court *which imposed the sentence* to vacate, set aside or correct *the sentence*." 28 U.S.C. § 2255(a) (emphasis added).

It is no answer to say Mr. Cox could wait until resentencing to seek relief on this ground: The writ of *audita querela* is specifically suited to providing relief from "the consequences" of a legally defective conviction, including one of the most obvious consequences: the sentence and sentencing proceeding. *See United States v. Johnson*, 962 F.2d 579, 582 (7th Cir. 1992) ("*Audita querela* is not a wand which may be waved over an otherwise valid criminal conviction, causing its disappearance; rather, it provides *relief from the consequences of a conviction* when a defense or discharge arises subsequent to entry of the final judgment.") (emphasis added).

---

[3] Because a § 2255 motion would be premature, and to preserve his rights after resentencing, Mr. Cox specifically requests that this motion *not* be construed as a § 2255 motion. *Cf. Castro v. United States*, 540 U.S. 375, 377 (2003) ("Under a longstanding practice, a court sometimes treats as a request for habeas relief under 28 U.S.C. § 2255 a motion that a pro se federal prisoner has labeled differently. Such recharacterization can have serious consequences for the prisoner, for it subjects any subsequent motion under § 2255 to the restrictive conditions that federal law imposes upon a 'second or successive' (but not upon a first) federal habeas motion.").

Proceeding to sentencing on a conviction that may well be defective with respect to federal jurisdiction also creates its own serious impediments. The sentencing proceeding itself, if based on a jury's jurisdictionally defective decision to convict, may impermissibly expand the Court's jurisdiction. Even if it does not, the sentencing judge must be able to identify the "the nature and circumstances" of an offense in order to determine a sufficient sentence. *See* 18 U.S.C. § 3353(a)(1). Here, however, the Court cannot know whether the jury relied on KJNP and acquitted on Anderson's database for being too speculative. Indeed, it cannot tell from the record whether the jury split their verdict, unable to agree on whether the targets were fictitious federal agents or state troopers. *See* Instruction 46, Dkt. 430 at 50 (requiring no unanimity as to the target of the murder conspiracy). The very nature of the offense on which the jury convicted is uncertain.

Even sentencing Cox solely on the theory on which the Ninth Circuit held jurisdiction *may have* been based invites problems. It is highly unlikely that the jury would have convicted Cox of conspiracy to murder federal employees based on this theory alone when the relevant evidence at trial showed that he agreed to create a database of largely state government actors for use in the extreme case of government collapse and ensuing martial law, characterized by mass arrests and purges akin to those carried out by Stalin in the 1930s in the Soviet Union. A new trial prior to resentencing is necessary to avoid these insuperable difficulties.

Apart from § 2255, the other most relevant postconviction remedy is a motion for a new trial under Federal Rule of Criminal Procedure 33. Unfortunately, while a § 2255 motion is too early, a new trial motion is too late unless the government waives its timeliness defense. A motion for a new trial must be brought 14 days from the jury verdict, regardless of what happens on appeal. Fed. R. Crim. P. 33(b)(2). While Rule 33 contemplates an extension of the strict 14-day deadline for motions grounded on newly

discovered evidence, there is no extension for appellate rulings that undermine the jurisdictional basis for another conviction. Fed. R. Crim. P. 33(b)(1). Rule 33 is not jurisdictional, and so the government may waive its timeliness defense, but that is the government's choice.[4]

Were a Rule 33 motion timely, it might be the ideal vehicle for Mr. Cox's claim. Consider what might have happened had this court granted Mr. Cox's motion for judgment of acquittal on the solicitation count, renewed after the close of evidence, because the supposed federal assassin team was fictional and therefore lacked federal jurisdiction. (Such an outcome is entirely plausible. This Court voiced skepticism about the federal assassin team during argument on the Rule 29 halftime motion. Dkt. 638 at 31–32.) Had a renewal Rule 29 motion on the solicitation count been granted, and the jury had still convicted on the conspiracy count, this Court could have granted a new trial motion solely because the evidence about Anderson's database was not overwhelming in a prosecution for conspiracy to murder federal employees, and the jury was prejudiced by misleading testimony about the legally irrelevant KJNP episode. *United States v. Alston*, 974 F.2d 1206 (9th Cir. 1992) ("If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.") (quoting *United States v. Lincoln*, 630 F.2d 1319 (8th Cir. 1980)).

---

[4] The government is welcome to waive its timeliness defense to a Rule 33 Motion given the unusual posture of this case and the importance of the federal jurisdictional questions at issue. *See United States v. Berry*, 624 F.3d 1031, 1042 (9th Cir. 2010) (citing *Eberhart v. United States*, 546 U.S. 12, 19 (2005) (holding that the government case waive a timeliness defense to an out-of-time Rule 33 motion because Rule 33's time limits are claims-processing rules, not jurisdictional rules)). If it waives its defense, this motion may be considered under Rule 33.

MOTION FOR A WRIT OF AUDITA QUERELA
(*Francis Schaeffer Cox*, CR11-022-RJB) - 17

Had this Court acquitted Mr. Cox of the solicitation count at the close of evidence, precisely as the Ninth Circuit did on appeal, a prompt new trial motion on the conspiracy conviction would have been both timely and justified. Under the current circumstances, the prejudice is much greater, because the prosecution fully embraced the KJNP episode as the primary basis for the conspiracy count in closing argument (see *infra* at 6–8), not knowing the solicitation theory lacked federal jurisdiction. But unless the government waives its timeliness defense, the Rule 33 remedy is not available to Mr. Cox, and a gap remains in the postconviction landscape that may only be filled by the writ of *audita querela*.

### D. The Ninth Circuit's Mandate Does Not Foreclose Relief

The writ of *audita querela* can be granted despite a mandate from an appellate court, so long as the prior proceeding does not foreclose the relief. *See Humphreys v. Leggett*, 50 U.S. 297 (1850). Here, the mandate specifies that "the judgment of the Court, entered August 29, 2017" took effect November 15, 2017. The judgment, in turn, "vacate[d] Defendant's sentences on all counts of conviction and remand[ed] with instructions to resentence Defendant in light of our reversal of his solicitation conviction." Mem. Op. at 6. The mandate thus was unaffected by the Ninth Circuit panel's vote to deny Mr. Cox's petition for rehearing.

"The rule of mandate requires a lower court to act on the mandate of an appellate court, without variance or examination, only execution." *United States v. Garcia–Beltran*, 443 F.3d 1126, 1130 (9th Cir. 2006) (quoting *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895)). However, "courts are often confronted with issues that were never considered by the remanding court." *United States v. Kellington*, 217 F.3d 1084, 1093 (9th Cir. 2000). Upon receiving the Ninth Circuit's mandate, this Court is free to do anything not "foreclosed by" the mandate or that does not run counter to the "spirit"

of the circuit court's decision. *Cassett v. Stewart*, 406 F.3d 614, 621 (9th Cir. 2005) (quoting *Kellington*, 217 F.3d at 1092–93).

There is no question that this Court will ultimately resentence Mr. Cox in accordance with the mandate, without reimposing a sentence on his now-vacated solicitation conviction, because he has a number of remaining weapons charges that are unaffected by the new legal objection to his conspiracy conviction. The Court will be following both the letter and spirit of the mandate when it ultimately resentences Mr. Cox. Further, the Ninth Circuit memorandum opinion did not deny a request for a new trial on the conspiracy count on jurisdictional grounds; therefore, it did not foreclose such a motion. *Cf. Flame S.A. v. Freight Bulk Pte. Ltd.*, 807 F.3d 572, 579–80 (4th Cir. 2015) (declining to apply the mandate rule to preclude a challenge to subject-matter jurisdiction despite a prior Fourth Circuit ruling that subject-matter jurisdiction existed where "the substantive questions" analyzed in the first ruling were "distinct" from the appellant's new arguments).

At the same time, the jurisdictional defect revealed by the Ninth Circuit's order vacating the solicitation count is the kind of fundamental problem that should be addressed as soon as it is brought to the attention of this Court. "Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute[.]" *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S. Ct. 1673, 1675 (1994). In a federal criminal prosecution, the question of subject-matter jurisdiction is congruent with the question of the breadth of the jurisdictional element in the statute a defendant is alleged to have violated. *Bowles v. Russell*, 551 U.S. 205, 212 (2007) ("Within constitutional bounds, Congress decides what cases the federal courts have jurisdiction to consider"). The jurisdictional requirements of a federal criminal prosecution continue to bind the court throughout the trial and "in rendering judgment." *In re Bonner*, 151 U.S. 242, 256–57 (1894).

It is axiomatic that defects in subject-matter jurisdiction may be raised at any time, even after a conviction. *Dyer v. Greif Bros., Inc.*, 766 F.2d 398, 401 n.2 (9th Cir. 1985); *United States v. Burch*, 169 F.3d 666, 668 (10th Cir. 1999). Federal courts are "obliged to inquire sua sponte whenever a doubt arises as to the existence of federal jurisdiction." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 278 (1977). These exceptions from ordinary timing and waiver rules demonstrate the overriding importance of subject-matter jurisdiction.

Because the act of resentencing Mr. Cox on a conviction whose jurisdictional foundation has been undermined itself raises issues as to the bounds of this court's jurisdiction, the Court should grant the writ and is not foreclosed from doing so by the Ninth Circuit's mandate. This common-law remedy, like that of coram nobis,

> issues only in extreme cases. But the long-recognized authority of a court to protect the integrity of its earlier judgments impels the conclusion that the finality rule is not so inflexible that it trumps each and every competing consideration. Our holding allows [ ] courts to protect the integrity of their dispositions and processes by granting relief from final judgments in extraordinary cases when it is shown that there were fundamental flaws in the proceedings leading to their issuance.

*United States v. Denedo*, 556 U.S. 904, 916 (2009).

### E.    A New Trial Is the Appropriate Relief

Here, the requested remedy of a new trial is the only relief that both cures the jurisdictional defect and complies with the Ninth Circuit mandate.

"Conceptually," the Ninth Circuit has said of other forms of postconviction relief such as habeas, any remedy "should put the defendant back in the position he would have been in if the … [jurisdictional defect] never occurred." *Nunes v. Mueller*, 350 F.3d 1045, 1057 (9th Cir. 2003). An adequate remedy "should be tailored to the injury suffered," and it must "neutralize the taint" of the defect. *United States v. Morrison*, 449 U.S. 361, 364–65 (1981).

Furthermore, "virtually all rights of criminal defendants" are "merely . . . right[s] not to be convicted," as distinguished from "right[s] not to be tried." *Class v. United States*, 138 S. Ct. 798, 811 (2018) (quoting *Flanagan v. United States*, 465 U.S. 259, 267 (1984)). For the purposes of this motion, Mr. Cox cannot contest the Ninth Circuit's holding that a rational juror *could have* convicted him on the basis of Mr. Anderson's database alone; he merely points to facts raising grave doubts that his jurors actually did so. The appropriate remedy is thus retrial on a jurisdictionally adequate theory rather than outright acquittal on the conspiracy count.

## CONCLUSION

This Court should grant the writ of *audita querela* and order a new trial on Count 12, conspiracy to murder federal officers or employees.

DATED this 29th day of November, 2018.

Respectfully submitted,

s/ *Michael Filipovic*
Federal Public Defender

s/ *Ann Wagner*
Assistant Federal Public Defender

Attorneys for Francis Schaeffer Cox

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**CERTIFICATE OF SERVICE**

I certify that on November 29, 2018, I filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of filing to Assistant United States Attorney Steven Skrocki. I further certify I mailed a copy of this motion to Francis Schaeffer Cox at USP Terre Haute.

s/ *Suzie Strait*
Paralegal