MICHAEL FILIPOVIC
Federal Defender
ANN WAGNER
Assistant Federal Defender
Attorneys for Francis Schaeffer Cox
FEDERAL PUBLIC DEFENDER FOR THE
WESTERN DISTRICT OF WASHINGTON
1601 5th Avenue, Suite 700
Seattle, Washington 98101
Phone: (206) 553-1100
Fax: (206) 553-0120
Email: Michael_Filipovic@fd.org
        Ann_Wagner@fd.org

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR11-022-RJB |
| | ) | |
| Plaintiff, | ) | |
| | ) | DEFENDANT'S RE-SENTENCING |
| v. | ) | MEMORANDUM |
| | ) | |
| FRANCIS SCHAEFFER COX, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## TABLE OF CONTENTS

I.  Introduction ................................................................ 1

II. The Nature and Circumstances of the Conspiracy Offense in Light of the Ninth
    Circuit's Memorandum Opinion ............................................ 2

    A.  The Nature of the Offense Is Limited to a Single Government Theory: Mike
        Anderson's Database ................................................. 3

1

   B. The Database Conspiracy Was Expressly Contingent on Objectively Unlikely Events: the Imposition of Martial Law, Characterized by Mass Arrests and Purges as in Stalin's Soviet Union, and the Identification of Any Government Employees Who Were Carrying Out Such Arrests..............................................8

   C. The Facts Underlying this Conviction Have Never Before Given Rise to Federal Criminal Liability, They Would Not Be Sufficient for Conspiracy Liability in the First and Possibly Seventh Circuits, and a Similar Militia Case Was Dismissed with Prejudice by a District Court in Michigan. ............9

   D. In Comparison with Other Uncompleted Conspiracy to Murder Convictions to Which the Guideline Would Apply, Cox's Conduct Was Far Less Dangerous and Reflects Substantially Less Culpability. ..................................13

III. Imperfect Entrapment Is a Strong Mitigating Circumstance Not Previously Argued or Considered and It Supports a Significant Departure and Variance in Mr. Cox's Sentence. ...................................................................................................17

   A. Background to the Involvement of Informants Bill Fulton and J.R. Olson ...21

   B. Inducement and Threats by Fulton and Reluctance by Cox ...........................23

   C. Inducement by J.R. Olson and Reluctance by Cox ........................................26

   D. Cox's Decision and Preparations to Flee as Powerful Evidence of Reluctance ........................................................................................................30

   E. The Evidence of Imperfect Entrapment Is a Mitigating Factor Establishing Mr. Cox Is Less Morally Blameworthy and Less Dangerous than Someone Who Would Eagerly Pursue an Agreement and a Plan to Kill Federal Employees. ........................................................................................................32

IV. Mr. Cox's Mental Health and the Court's Concern About Future Dangerousness .34

   A. The Court Was Misled by the Psychological Evaluation Presented at the First Sentencing Hearing ..........................................................................................34

   B. Concern About Mr. Cox's Ability to Influence Others ...................................37

2

    C.  None of the Federal Employees Identified by the Government for the Conspiracy to Murder Charge Were Placed in Actual Danger of Physical Harm. ...................................................................................... 38

    D.  Mr. Cox's Outrageous and Offensive Statements ............................... 39

    E.  Cox's Ability to Find Pro-Social Avenues to Address Conflict and to Discern More Meaningful Solutions to Problems. .......................................... 40

V.  Conditions of Confinement and Danger in Prison Should Be Considered in Determining the Length of Mr. Cox's Sentence. ........................................... 41

VI.  Defense Objections to Probation Guideline Calculations ............................ 43

    A.  The § 3A1.2(b) Adjustment Does Not Apply Because Mr. Cox Was Not Motivated to Murder the Three Federal Employees on Anderson's Notepad Because of Their Status as Federal Government Employees. ........................ 43

VII.  CONCLUSION ........................................................................................ 46

3

## I. Introduction

The Ninth Circuit Court of Appeals vacated Francis Schaeffer Cox's solicitation to murder federal officers conviction, "vacate[d] his [remaining] sentences, and remand[ed] to the district court for resentencing." 705 Fed. App'x 573, 577 (Aug. 29, 2017). This is a plenary or unrestricted and comprehensive resentencing. *United States v. Matthews*, 278 F.3d 880, 885 (9th Cir. 2010) (en banc). The Court's reversal of Mr. Cox's solicitation conviction and the limited basis upon which it affirmed his conspiracy to murder federal employees conviction puts Mr. Cox's case in a much different light for resentencing.

In addition to addressing how the reversal of the solicitation conviction affects the sentencing analysis, the defense will present new information and evidence not provided to the Court at Mr. Cox's first sentencing hearing, including information from discovery materials received before trial and discovery provided after the first sentencing hearing, information obtained from Freedom of Information Act (FOIA) requests, and information from defense investigation. We also provide the Court with the report of Dr. Mark Cunningham (Sealed Exhibit A) and reports from BOP mental health professionals (Sealed Exhibit B) debunking the psychological evaluation by Dr. Robin Ladue, which misled the Court into concluding that Mr. Cox had serious mental health issues requiring custodial treatment, suggested future dangerousness, and that he thus needed to be specifically deterred by a long sentence. The Court is also presented with additional and different legal grounds for mitigation, including imperfect entrapment, a recognized ground for downward departure not presented to or considered by the Court at Mr. Cox first sentencing hearing. Objections to the Probation Office's revised guideline calculations are set forth below and in the defense letter of objections sent to US Probation on March 22, 2019. Ex. 1.

1

Schaeffer Cox has been imprisoned since March 10, 2011, a period of almost 104 months, and he has served over 10 years of his term of imprisonment. We respectfully request that Mr. Cox be sentenced to a total term of no more than 120 months of imprisonment.

## II. The Nature and Circumstances of the Conspiracy Offense in Light of the Ninth Circuit's Memorandum Opinion

Among the recognized grounds for a variance from the advisory guidelines range are when "(as the Guidelines themselves foresee) the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply," as well as when "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations." *Rita v. United States*, 551 U.S. 338, 351 (2007). A district court's decision to vary from the guidelines for an outside-the-heartland case is entitled to the "greatest respect." *Kimbrough v. United States*, 552 U.S. 85, 109 (2007).

Here, Mr. Cox's conviction for first-degree conspiracy to murder federal employees—based on an anxiety-fueled agreement to resist if the remote possibility that "Stalinesque" mass arrests and purges at the hands of government officials came true—is at the extreme margins, rather than the heartland, of the USSG § 2A1.5(a) guideline for conspiracies to murder, as well as the § 3A1.2(b) enhancement for official victims.[1] Indeed, the facts underlying this conviction would not be sufficient for a conspiracy conviction in the First Circuit, and a similar militia case was dismissed with prejudice by a district court in Michigan. Similarly, the fact that this offense is a far from typical example of a first-degree conspiracy to murder means that the "nature and circumstances" of this offense suggest a far-below-guidelines sentence. *See* 18 U.S.C. § 3553(a)(1).

---

[1] Mr. Cox also contests the application of the § 3A1.2(b) adjustment. *See* Section VI.

## A. The Nature of the Offense Is Limited to a Single Government Theory: Mike Anderson's Database.

The first step in characterizing the nature of the offense is to determine what is left of the conspiracy conviction after the Ninth Circuit's decision upholding the sufficiency of the conviction but striking down the solicitation count.[2] It is important to keep in mind that these two crimes share an identical jurisdictional element—the target of the murder plot (or solicitation) must be an "officer or employee of the United States"—and both are subject to self-defense arguments. *See* 18 U.S.C. §§ 1117 & 1114; 18 U.S.C. §§ 373 & 1114.

Although the Ninth Circuit's memorandum opinion could have been clearer, a careful reading of the opinion in the context of the briefing before the Court shows that *only* Anderson's database provided sufficient evidence to uphold the conspiracy conviction.

The government had argued to the Ninth Circuit that there were three separate theories supporting the conspiracy conviction:

- Anderson's database of state officials, with a separate notepad listing three names of federal employees that Cox had provided but which Anderson never researched or added to the database, Gov't Answering Br., Dkt. 126 at 111–123, No. 13-30000 (9th Cir. Feb. 27, 2017);

- the KJNP security detail providing defense against fictional federal assassins, *id.*, 9th Cir. Dkt. 126 at 123–127;

---

[2] Notably, the theory that the Ninth Circuit based its sufficiency holding on was not necessarily the sole theory that the jury agreed conferred liability for the conspiracy conviction. Indeed, because the government's closing argument relied heavily on the KJNP theory, *see* Dkt. 646 at 52–61, 107; Dkt. 647 at 17–18, 38, and the jury convicted Mr. Cox of the solicitation count, which was based entirely on KJNP, it is likely the jury's conclusion regarding conspiracy liability relied either in part or in full on the discredited KJNP theory.

3

- the "2-4-1" discussions in which Cox, the government informant Olson, Barney,[3] and Vernon debated whether to adopt a plan in which two state employees would be "arrested" if one of their group were arrested, or two state employees killed if one of them were killed. *Id.*, 9th Cir. Dkt. 126 at 117–20.

On reply, Mr. Cox argued that each of these theories lacked federal jurisdiction because there was insufficient evidence of the element of the offense requiring the target of the murder plot to be an "officer or employee of the United States," 18 U.S.C. § 1114, citing to *United States v. Feola*, 420 U.S. 671, 695–96 (1975) ("Where the object of the intended attack is not identified with sufficient specificity so as to give rise to the conclusion that had the attack been carried out the victim would have been a federal officer, it is impossible to assert that the mere act of agreement to [murder] poses a sufficient threat to federal personnel and functions so as to give rise to federal jurisdiction."). Reply Br., Dkt. 143 at 26, 31–48, No. 13-30000 (9th Cir. June 21, 2017).

On KJNP, in addition to federal jurisdiction, Mr. Cox argued that there was no conspiracy to murder because the security detail was providing self-defense against the fictitious assassin team. *Id.*, 9th Cir. Dkt. 143 at 44–45. He separately argued the *solicitation* conviction based solely on KJNP was insufficient for the same two reasons: federal jurisdiction and the self-defense objective that negated the intent to have others murder with premeditation and malice aforethought. *Id.*, 9th Cir. Dkt. 143 at 48–49.

As for 2-4-1, in addition to federal jurisdiction, the briefs pointed out that the discussions showed there was no actual *agreement* between the coconspirators to adopt 2-4-1; indeed, Cox's "definitive plan for [the day he planned not to appear for court]" was

---

[3] Because the jury hung on Barney's conspiracy count, Dkt. 432 at 3, it is clear that there was no jury unanimity as to the question whether any agreement between Cox and Barney to murder existed.

4

> "try[ing] to lay low Monday and avoid—if they do—if they're coming
> out with bench warrant, avoid it and try to hit them with paperwork every
> way I can." ER 412. In the event that Cox were arrested or killed, he
> suggested, "the thing you could probably get everybody to go in on"—
> i.e., agree to—"is just raise hell. . . . by having—picketing and just like—
> well, not quite a riot, but almost, you know? And on the radio and on TV
> and—sit-ins and just every kind of, you know, peaceful protest and just
> get everybody's panties in a wad . . . ." ER 412–13.

Reply Br., 9th Cir. Dkt. 143 at 47; *see underlying citation at* Ex. 2 at 38. Tellingly, the government admitted at closing arguments that the 2-4-1 topic was the subject of "a roundtable conversation" and a "debate," rather than ever characterizing it as an "agreement," Dkt. 646 at 87, and Coleman Barney's attorney told the jury without objection that the "2-4-1 stuff . . . . is not charged as a crime. It's one of the four weeks of trial out of the five weeks that doesn't pertain to these weapons charges and murder charges." *Id.* at 157.

With respect to Anderson's database, meanwhile, Mr. Cox argued to the Ninth Circuit at length that a contingent conspiracy whose "objective likelihood" was "remote"—such as an agreement to kill the perpetrators of unlawful mass arrests only if "Stalinesque" martial law was being carried out in the United States—was not sufficient to confer conspiracy liability at all, citing precedent in the First Circuit holding such evidence insufficient. *See* Opening Br., Dkt. 112 at 76, No. 13-30000 (9th Cir. Oct. 12, 2016) (citing *United States v. Palmer*, 203 F.3d 55, 64 (1st Cir. 2000) (liability for a conspiracy attaches only where the government can show that "the defendant reasonably believed that the conditions would obtain")); Reply Br., 9th Cir. Dkt. 143 at 26–36. He also argued that under *Feola*, the contingency relating to the jurisdictional element was also insufficient:

> Whether the database would be used at all depended on two separate
> developments: first, the imposition of martial law ("mass arrests, purges
> of various groups"), and second, the identification of persons responsible
> ("identifying who was doing it"). Only if the database contained the name
> of someone who had a hand in the enforcement of martial law did

5

> Anderson and Cox contemplate "kill[ing] them before they could come
> for us," as Solzhenitsyn wished his countrymen had done. Cox and
> Anderson did not contemplate killing anyone in the database unless they
> were responsible for mass arrests or mass purges. Because Cox and
> Anderson never identified any federal employee as one of the people
> carrying out mass arrests pursuant to the imposition of martial law, *Feola*
> forbids a § 1117 conviction on these facts.

Reply Br., 9th Cir. Dkt. 143 at 39 (quoting Dkt. 401 at 10–11); *see underlying citation at* Dkt. 629 at 58.

In light of this briefing, the Ninth Circuit's memorandum opinion becomes more clear. The Ninth Circuit held that the solicitation conviction, which it recognized was based solely on the KJNP episode, *see* Mem. Op., Dkt. 159-1 at 4 n.1, No. 13-30000 (9th Cir. Aug. 29, 2017), was constitutionally insufficient "for two independent reasons." *Id.*, 9th Cir. Dkt. 159-1 at 4. First, responding to the defense's self-defense arguments, the Court held that "no rational trier of fact could conclude that the circumstances surrounding the formation of the security team for the television station event 'strongly confirm[ed] that [D]efendant actually intended' for anyone to commit first-degree murder." *Id.* (quoting *United States v. Stewart*, 420 F.3d 1007, 1020–21 (9th Cir. 2005)). Second, the Ninth Circuit held that "because the federal 'hit team' that the security team was supposed to guard against did not exist," there was insufficient federal jurisdiction (*i.e.*, insufficient evidence that the target of the solicitation was an "officer or employee of the United States"). *Id.* (citing *United States v. Feola*, 420 U.S. at 695–96).

As this Court intuited during trial, the fact that the fictitious "federal" assassins "might as well have been little green men from Mars" also eliminates a major basis for the conspiracy conviction. *See* Dkt. 638 at 32. Where the federal assassins simply did not exist, there was insufficient evidence of federal jurisdiction for the conspiracy conviction on the KJNP theory, just as there was insufficient evidence for the

solicitation conviction on this theory. The self-defense objective also negates the mens rea required for a first-degree murder conspiracy on the KJNP theory.

But the Ninth Circuit ultimately upheld the conspiracy conviction by ruling against the defense on two arguments concerning Anderson's database: objectively unlikely contingent conspiracy and federal jurisdiction. The Ninth Circuit ruled that there was sufficient evidence because "Defendant and his co-conspirators agreed to attack government officials—*including federal officers—in the event of certain conditions that they subjectively thought were likely to occur*," Mem. Op., 9th Cir. Dkt. 159-1 at 3 (emphasis added), and that this scenario gave rise to sufficient federal jurisdiction.[4] *Id.* Read in context, this is an unmistakable holding that Cox's conspiracy conviction is now premised on a single theory: Anderson's database. Only with respect to the database theory did the government have evidence of an agreement with regard to "federal officers"—the three names given by Cox to Anderson but which Anderson never researched or added to the database. And only with respect to the database theory had the defense argued that any "subjective" belief in the likelihood of a contingency was not enough, that it had to instead be objectively reasonable belief.

Of course, the Ninth Circuit did not hold that an objectively unlikely contingent conspiracy to resist "Stalinesque" martial law fell within the heartland of the offense of conspiracy to murder—a question reserved for this Court on resentencing. It does not.

//

//

---

[4] Although the Ninth Circuit stated that "[a] rational trier of fact could also conclude that 'the agreement, standing alone, constituted a sufficient threat to the safety of a federal officer so as to give rise to federal jurisdiction,'" this question was never actually asked of the jury. Mem. Op., Dkt. 159-1 at 4 (quoting *Feola*, 420 U.S. at 695–96.)

7

Case 3:11-cr-00022-RJB   Document 740   Filed 10/07/19   Page 10 of 50

**B.** **The Database Conspiracy Was Expressly Contingent on Objectively Unlikely Events: the Imposition of Martial Law, Characterized by Mass Arrests and Purges as in Stalin's Soviet Union, and the Identification of Any Government Employees Who Were Carrying Out Such Arrests.**

The nature of the remaining database theory is an expressly contingent conspiracy that was unlikely to ever occur. The theory involved a discussion between government witness Mike Anderson and Cox during the summer of 2009 about the possibility of government collapse and the ensuing imposition of "Stalinesque" martial law, by which they meant the use of "mass arrests [and] purges" by the government. Dkt. 629 at 57–58. Anderson testified under immunity that he and Cox discussed creating a database of government employees, which they could use to help "identify who was [carrying out the mass arrests and purges]." *Id.* at 58, 62. Alluding to "a quote out of Ale[ksandr] Solzhenitsyn"'s *Gulag Archipelago*, Anderson explained that in the event of such mass arrests, "we would want to be able to protect ourselves rather than just lay down and let it happen." *Id.* at 57. The quotation Anderson was referring to reads in full:

> What would things have been like if . . . during periods of mass arrests, as for example in Leningrad, when they arrested a quarter of the entire city, people had not simply sat there in their lairs, paling with terror at every bang of the downstairs door and at every step on the staircase, but had understood they had nothing left to lose and had boldly set up in the downstairs hall an ambush of half a dozen people with axes, hammers, pokers, or whatever else was at hand?

Aleksandr Solzhenitsyn, *The Gulag Archipelago: 1918-1956*, at 13 n.5 (1973). Whether the database would be used at all depended on two separate contingencies: first, government collapse and the use of mass arrests as in Stalin's Soviet Union, and second, the identification of persons responsible for those mass arrests.

Although Cox gave Anderson the names of three federal employees—Nanette Curtis, Tom Studler, and Trina Beauchamp—Anderson did not add them to the

8

database, and did no research on them. The names were buried and forgotten until the raid on Anderson's property in March 2011. And although Anderson also independently encountered the name of a federal marshal, there was clearly no agreement between Cox and Anderson to murder him, because Anderson never told Cox the name or anything about him. Dkt. 629 at 171, 190–91. Apart from the notepad obtained during the raid of Anderson's property, none of these four names of federal employees appear *anywhere* else in the over 12,000 pages of transcripts of the surreptitious recordings that government informants made of Cox, Olson, Fulton, Barney, or the Vernons. If the coconspirators were intent on murdering any of them, they certainly had an odd way of showing it.

C.     **The Facts Underlying this Conviction Have Never Before Given Rise to Federal Criminal Liability, They Would Not Be Sufficient for Conspiracy Liability in the First and Possibly Seventh Circuits, and a Similar Militia Case Was Dismissed with Prejudice by a District Court in Michigan.**

The fact that this conspiracy conviction is an extreme outlier is demonstrated by the fact that counsel has been unable to locate even a single other murder conspiracy conviction for conduct as attenuated and conditional as this one. In the only other federal murder conspiracy case counsel has been able to identify addressing a scenario that could reasonably be described as "contingent," *United States v. Gartman*, No. 95-5701, 1997 WL 195923 (4th Cir. Apr. 23, 1997), the agreement was that if the conspirators were successful in murdering the first target, they would proceed to murder the other three targets (including two federal employees). *Id.* at *3. The defendant went so far as to offer the coconspirators a reward of $30,000 for each federal target. *Id.* at *1. Unlike the contingent conspiracy here, the *Gartman* conspiracy concerned a contingency that was entirely within the conspirators' control. A contingency of successfully murdering one target cannot be analogized to the purely external contingency of government collapse and "Stalinesque" mass arrests and purges.

9

The type of contingent conspiracy at issue here is not only rare, it actually would not have amounted to a crime in at least one other jurisdiction. According to the First Circuit, liability for contingent conspiracies "should attach if the defendant *reasonably* believed that the conditions would obtain." *United States v. Palmer*, 203 F.3d 55, 64 (1st Cir. 2000) (emphasis added) (citing *United States v. Dworken*, 855 F.2d 12, 19 (1st Cir. 1988)). If, as here, the contingency was an objectively unlikely event on a historical scale—the imposition of "Stalinesque" mass arrests and purges here in the United States—liability would not attach. The question whether Cox's conduct would have amounted to a conspiracy in the Seventh Circuit, meanwhile, is an open question: "[W]e need not decide in this case how to deal with the situation where an agreement is conditioned on an event that is highly unlikely ever to occur." *United States v. Podolsky*, 798 F.2d 177, 179 (7th Cir. 1986). "Stalinesque" martial law is highly unlikely ever to occur in the United States, where individual due process and trial by a jury of one's peers are rights enshrined in the Constitution, so liability might not have attached in the Seventh Circuit either.

One case that can be profitably compared to the facts underlying the conspiracy conviction here, meanwhile, ended in dismissal with prejudice. When Cox's prosecutors were trying to fit the unusual facts of this case to some federal crime, they first had the idea of charging him with seditious conspiracy as another case concerning militia members had been charged in Michigan. *See* Ex. 3. They sought the search warrant in the Michigan case, called the prosecutors on that case, and after reading case law, Mr. Skrocki suggested that the "sedition statute," 18 U.S.C. § 2385, is "equally applicable here." Ex. 3 at 1, 3–5. He then emailed the FBI agents working the Cox case, instructing them, "On the hutaree warrant, check out the seditious conspiracy charge— if they hand out a list of targets and orders to go active, if Hutaree is any example I think we might be in a better spot to consider it." Ex. 3 at 2. The Hutaree militia

members were charged with, inter alia, seditious conspiracy in violation of 18 U.S.C. § 2384, which carries a maximum term of imprisonment of twenty years. *See* Indictment, Dkt. 4 at 3–7, *United States v. Stone et al.*, Case No. 2:10-cr-20123 (E.D. Mich. March 29, 2010). The "general concept" of the conspiracy, according to the indictment,

> provided that the HUTAREE would commit some violent act to draw the attention of law enforcement or government officials and which would prompt a response by law enforcement. Possible such acts which were discussed included killing a member of law enforcement after a traffic stop, killing a member of law enforcement and his or her family at home, ambushing a member of law enforcement in rural communities, luring a member of law enforcement with a false 911 emergency call and then killing him or her, and killing a member of law enforcement and then attacking the funeral procession motorcade with weapons of mass destruction . . . .

> [O]nce such action was taken, HUTAREE members would then retreat to one of several 'rally points' where the HUTAREE would wage war against the government and be prepared to defend in depth with trip-wired and command-detonated anti-personnel Improvised Explosive Devices (IED), ambushes, and prepared fighting positions. It is believed by the HUTAREE that this engagement would then serve as a catalyst for a more wide-spread uprising against the government.

*Id.*, Dkt. 4 at 4–5. Ultimately, Cox's prosecutors abandoned this charge, but they continued to pursue this basic theme all the way through closing arguments, suggesting "conspiracy to murder federal officials" wasn't really the point:

> The reason we're here this morning is because you've seen over the past six weeks evidence that [Cox, Barney, and Vernon] *are working on a plan, they're working on another form of government*. And in the long term, we're not telling you that it was going to happen today, that it was going to happen tomorrow, that it was going to happen next week. . . .

> Mr. Cox possessed a machine gun; Mr. Cox wanted grenades; Mr. Cox had a silenced pistol; Mr. Cox had a militia, a lot of other entities he was using to upswell his stock in Fairbanks. *And he was doing it to form the sovereign republic of Schaeffer Cox.* That fact, we submit, is indisputable.

Dkt. 646 at 48–49 (emphasis added); *see also id.* at 62, 69, 92; Dkt. 647 at 5, 7, 14, 29, 34.

Meanwhile in Michigan, the district court judge ended up granting Rule 29 motions as to the seditious conspiracy charges, ruling that although the lead defendant "brings up the idea of murdering an officer and attacking the funeral procession,"

> Nothing resembling an agreement to spark an uprising with the Federal Government is reached during this conversation. Defendants toss out ideas of ways in which to kill police that are often incredible; more importantly, they never come to a consensus or agreement on ways in which to oppose federal agents by force. Stone even states, "there's a hundred and one scenarios you can use." This back and forth banter, like the other anti-government speech and statements evincing a desire—even a goal—to kill police, is simply insufficient to sustain the seditious conspiracy charge; it requires *an agreement and a plan of action*, *not mere advocacy* or hateful speech.

Order of Acquittal, Dkt. 767 at 17, *United States v. Stone et al.*, Case No. 2:10-cr-20123 (E.D. Mich. March 27, 2012) (emphasis in original). These facts are more serious than the facts underlying Cox's murder conspiracy charge, and yet they gave rise to acquittals. Had the government charged seditious conspiracy in Cox's case—the real gist of the murder conspiracy charge—Cox might well have been acquitted. It is also at least possible that with better legal representation at trial, Cox could have had a shot at acquittal based on similar arguments against the murder conspiracy. *See* Dkt. 430 at 33 (Court's jury instruction 29) ("You must find that there was *a plan* to commit at least one of the crimes alleged as an object of the conspiracy with all of you agreeing as to the particular crime which the conspirators agreed to commit.") (emphasis added).

The fact that Mr. Cox's conduct would not have given rise to conspiracy liability in the First Circuit and might have led to acquittal had the real gist of the offense, according to the government, been charged, also weighs in favor of a much reduced sentence here.

### D. In Comparison with Other Uncompleted Conspiracy to Murder Convictions to Which the Guideline Would Apply, Cox's Conduct Was Far Less Dangerous and Reflects Substantially Less Culpability.

The nature of the conspiracy (and surrounding circumstances) in Cox's case means it was less likely to be fulfilled and also reflects less culpability compared to heartland offenses.

Scholars and courts have long worried about the potential breadth of conspiracy liability. *See Krulewitch v. United States*, 336 U.S. 440, 449 (1949) (Jackson, J., concurring) ("[T]he looseness and pliability of the [conspiracy] doctrine present inherent dangers which should be in the background of judicial thought wherever it is sought to extend the doctrine to meet the exigencies of a particular case."). Legal scholars have been particularly concerned with the grafting of conspiracy liability onto expressly conditional agreements. After all, contingent conspiracies disrupt the ordinary calculus as to what "point in the continuum between preparation and consummation[ ] the likelihood of a commission of an act [has become] sufficiently great and the criminal intent sufficiently well formed to justify the intervention of the criminal law." *Feola*, 420 U.S. at 694.

Professors Larry Alexander and Kimberly Kessler have termed liability for conditional purpose conspiracies "radical." Larry Alexander & Kimberly D. Kessler, *Mens Rea and Inchoate Crimes*, 87 J. Crim. L. & Criminology 1138, 1142 (1997). As a thought experiment, they asked readers to "[c]onsider John and Jack, who agree after buying a ticket in the lottery that if they should win the jackpot, they will murder their wives and spend their millions on high living. [This rule] would label this agreement a conspiracy to murder, despite the fact that John and Jack's chance of winning is infinitesimal." *Id.* Then-Professor Neil Katyal has argued for concrete limitations to the MPC's conditional purpose doctrine: "The criminal law should punish activity where people genuinely intend to fulfill their illegal aims and where the chances of their doing

so are high. But neither deterrence nor retribution is served by criminalizing threats with remote conditional triggers." Neil Katyal, *Probable Failure of Conditional Purpose*, 32 Crim. L. Bull. 25, 35 (1996).

Although Cox was convicted of conspiracy to murder, he did not "genuinely intend to fulfill" the murder of the three federal employees on Anderson's notepad. Instead, he wished to prepare for the "remote conditional trigger" of "Stalinesque" martial law—and did not know whether any of the individuals he named would end up being responsible for carrying it out. *Cf.* Sealed Ex. A at 14–16 (describing Cox's prepping behaviors). After Anderson wrote down the names, Anderson did not look up their addresses or anything else about them, and did not add them to the database. Martial law did not come to pass.[5] The Ninth Circuit held that these facts "constituted a sufficient threat to the safety of a federal officer so as to give rise to federal jurisdiction," Mem. Op., 9th Cir. Dkt. 159-1 at 3, but under the Ninth Circuit's ruling, even an "infinitesimal" threat, to use Professors Alexander and Kessler's terminology, suffices. But precisely because of the highly unlikely contingency, Cox's theory was far less likely than a noncontingent conspiracy to be fulfilled.

And although conspiracies are often thought to present greater danger than a person acting alone, the group decision making in Mr. Cox's case led to arguably better decisions and less violence, compared to a plan for violence by a lone wolf. The logic of prosecuting conspiracies despite the absence of actual violence or other antisocial behavior is often premised on the purported danger of group action and the relative ease with which it can go undetected. *See Callanan v. United States*, 364 U.S. 587, 593

---

[5] Although the government informant Olson heard about the database and, following the instructions of his handler Sutherland, sought the database from Anderson, Anderson destroyed the database rather than give it to him. Dkt. 401 at 86, 93–94 (Olson contacted Anderson for list); Dkt. 451 at 52 (Sutherland asked Olson to ask). Conspiracy liability also cannot be based on an agreement between a government informant and a defendant. *United States v. Escobar de Bright*, 742 F.2d 1196, 1199 (9th Cir. 1984).

14

(1961) ("Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality."); *see also Pinkerton v. United States*, 328 U.S. 640, 644 (1946). But outside the law of conspiracy, many theorists recognize that "the exchange of opinion with others checks our partiality and widens our perspective; we are made to see things from their standpoint and the limits of our vision are brought home to us. . . ." John Rawls, *A Theory of Justice* 358–59 (1971). This intuition is backed by empirical research showing that decisions made by a group are often better than a decision made by a single individual, and put into practice through the widespread use of groups of people to make important decisions (among them juries, appellate judges, and the Supreme Court). *See* Cass R. Sunstein, *Group Judgments: Statistical Means, Deliberation, and Information Markets,* N.Y.U. L. Rev. 962, 971–73 (2005); *see also* Pauline T. Kim, *Deliberation and Strategy on the United States Court of Appeals: An Empirical Exploration of Panel Effects*, 157 U. Penn. L. Rev. 1319, 1321 (2009) (citing Lewis A. Kornhauser and Lawrence G. Sager, *Unpacking the Court*, 96 Yale L.J. 82, 98 (1986)). In Mr. Cox's case, group discussions contributed to a rejection of the 2-4-1 concept (despite the encouragement of the government informant Olson). *See* Ex. 2. Regarding Anderson's database, the involvement of Anderson, an independent decision maker who was not in regular contact with the conspirators, meant that he could destroy the database when the potentially dangerous "coconspirator" Olson sought access to it. Dkt. 401 at 106–07. Group decision making in this case inhibited violence rather than inflaming it.

Cox's agreement with Anderson is also clearly less culpable than a noncontingent conspiracy to murder. Many readers of *Gulag Archipelago* no doubt sympathize with Solzhenitsyn's fantasy of armed resistance to Stalin's mass arrests. The difference between those readers and Cox is, at least in part, a personality more

inclined to anxiety, and a cultural and political milieu that encouraged such fears. *Cf.*
Sealed Ex. A at 14 (describing how Cox's anxiety was "augmented and shaped by
numerous contemporaries who shared . . . apprehensions" about "government and the
breakdown of society more broadly").

The comparative danger of noncontingent conspiracies in which ideas were not
subject to vigorous debate is illustrated by examples of other federal murder conspiracy
convictions. Other cases in which defendants have been sentenced in federal court for
conspiracy to murder were not based on contingent agreements. They were not waiting
for an unprecedented event on a historical scale to occur before engaging in violence;
they were looking only for the opportunity to kill. For example, in *United States v.
Croft*, a defendant received a five-year sentence where

> [T]hree government witnesses testified that, after [a coconspirator]
> proposed murdering [the United States Attorney], [the defendant] made
> statements calculated to induce the other commune members to support
> the scheme. Moreover, witnesses testified that [the defendant] later took a
> count of who was 'in or out' of the scheme, became a member of the 'hit
> team,' and mediated a dispute concerning who would be the one to pull
> the trigger.

124 F.3d 1109, 1114, 1125 (9th Cir. 1997). In *United States v. Stewart*, the defendant
Sattar was convicted of, among other things, conspiring to kill persons abroad by
composing and audio recording a fatwa in the name of a terrorist religious leader that
commanded "the killing [of] the Jews wherever they are (UI) and wherever they are
found." 590 F.3d at 114. In contrast, Cox never made an agreement to kill any federal
officers wherever they are found. And Sattar's noncontingent plan was also much closer
to fruition. The government

> offered proof that this fatwa was communicated to Atia, [a terrorist
> group's] military leader. Although the evidence may not have established
> any particular plan of action to execute the fatwa, a reasonable jury could
> have found beyond a reasonable doubt from the fatwa's exhortations and
> Atia's readiness to act on it that there was a concrete, illegal objective to

16

murder persons abroad. A review of the transcripts of various intercepted telephone conversations introduced into evidence, particularly the September 18, 2000, conversation involving Sattar, Taha, and another party, bolsters this conclusion. The discussion goes well beyond the abstract and contemplates the coordination with Atia of violent actions, presumably along the lines of the Luxor massacre. In light of such evidence, a rational jury could have found beyond a reasonable doubt that the conspiracy . . . existed.

*Id.* Sattar received a 288-month sentence. And in *United States v. Dick*, Nos. 97-6085, 97-6086, 1999 WL 825037 (6th Cir. Oct. 6, 1999), defendants received sentences of 30 and 17 years for a conspiracy to kill an FBI agent in which one defendant's cell mate testified that the defendant had him pass on a message to a feigned hit man to the effect that the defendant wanted to have the FBI agent killed, and a coconspirator then arranged for the FBI agent to come to a designated location.

Mr. Cox's conspiracy conviction is far outside the heartland of the conspiracy to murder guideline, even where the conspiracies were not fulfilled. His sentence should reflect the lower culpability his conviction reflects, in comparison to other defendants to which the guideline would apply, and the much diminished risk to the "targets" of the conspiracy, whom he did not genuinely wish to kill absent evidence that they were decimating the rule of law in the United States.

## III.   Imperfect Entrapment Is a Strong Mitigating Circumstance Not Previously Argued or Considered and It Supports a Significant Departure and Variance in Mr. Cox's Sentence.

At trial, defense counsel failed to request jury instructions on entrapment, but instead pressed an entrapment by estoppel defense which would only offer relief to some of the destructive device and weapons charges, and have marginal relevance to the overt acts alleged in the count 12 conspiracy charge. Dkt. 324 at 10 (proposed jury instruction 8). At the first sentencing hearing, counsel did not ask the Court to consider imperfect entrapment, a ground for departure well established in Ninth Circuit law, and instead raised sentencing entrapment as a ground for departure, another argument with

17

application only to the guidelines for the destructive device and weapons convictions. Dkt. 543 at 38–40. Neither entrapment theory previously presented by defense counsel addressed the most serious charges of conspiracy and solicitation to murder federal officers, and thus the Court had no reason to conduct an informed analysis or make a ruling regarding the "traditional" trial defense of entrapment, or the imperfect entrapment departure ground for sentencing.[6] Imperfect entrapment for departure or variance is relevant to Mr. Cox's most serious remaining conviction, the conspiracy to murder federal officers.

*United States v. McClelland*, 72 F.3d 717 (9th Cir. 1995), is the leading circuit authority on imperfect entrapment. Because that decision presents significant factual and legal parallels to Cox's case, an extended analysis of *McClelland* and its application to Mr. Cox is offered here.

The conspiracy to murder federal employees charge requires proof there was an agreement, including "a plan" to murder federal employees, and at least one overt act supporting that conspiracy. Dkt. 430 at 33, 47 (Court's jury instructions 29 and 46).[7] The trial testimony established that the government informants understood that evidence of a "plan" was important to the investigation and to their roles in the investigation. Both Bill Fulton and J.R. Olson pressed Cox at different times about a "plan." The informants threatened, encouraged, and induced Mr. Cox to create or at least articulate a concrete plan of action. With Fulton it centered on pushing for a plan of action regarding sovereign citizen arrest warrants for state court judge(s) so his men

---

[6] "[T]here was no sentencing entrapment that has been shown here where the government piles it on just to get a higher sentence." Dkt. 605 at 57.

[7] Contrary to the Court's instructions, the government in rebuttal argued "There's a lot of discussion by Ms. Haden about, you got to have a plan, right? Conspiracy doesn't require a plan," arguing that it only required an agreement not a plan to commit the crime of murder. *Compare* Dkt. 647 at 23, 27 *with* Dkt. 430 at 33 (Court's jury instruction 29) ("You must find that there was a plan to commit at least one of the crimes alleged as an object of the conspiracy...").

could execute a violent plan for their arrests. With Olson it was repeated badgering about the 2-4-1, the "Israeli" retaliation plan. Mr. Cox pushed back against both Fulton and Olson, and ultimately his "plan" became leaving Alaska with some vague and grandiose statements about returning at some undetermined date to wage guerilla warfare if necessary.

An analysis of that evidence under the legal standards governing imperfect entrapment establish this is a strong basis for sentence reduction which the Court should apply in making its sentencing decision. *McClelland* holds that even if the defendant first proposed the illegal action, and continued on that path, but later expressed serious reservations or reluctance in the face of an informant's inducements, that defendant is less morally blameworthy and less dangerous to public safety. *McClelland*, 72 F.3d at 726.

Comparing *McClelland* to Mr. Cox's case establishes that Mr. Cox presents a stronger case for mitigation than *McClelland* because there were stronger inducements by the informants in Cox than in *McClelland*; Mr. Cox was less predisposed to take action than McClelland; and Mr. Cox showed much greater reluctance to move forward with murder than did McClelland.

McClelland was convicted after trial of a murder-for-hire scheme. It was not contradicted that McClelland initially approached his roommate, who later became a government informant, and offered to pay him $10,000 to murder his estranged wife. That person went to the FBI, began to work for them as an informant, and recorded conversations with McClelland. McClelland was actively involved in planning the details of the murder, including purchasing airline tickets for the "hit man" with a fake name, purchasing a poisoning device, directing the "hit man" how to construct it, helping him pack for the trip, giving him a map and a picture of his estranged wife, and

driving him to the airport. *Id.* at 719–20. A specific plan had been established for a specific target, and concrete steps were taken to consummate that plan.

But, there was also evidence that the "hit man" encouraged McClelland, after he had received the unsolicited $10,000 offer. At various points during the planning stages McClelland showed some reluctance to move forward with the plan. *Id.* at 723. The jury was instructed but rejected the entrapment defense, and the trial judge denied the defense motions for an entrapment acquittal as a matter of law and outrageous government conduct. For sentencing, the district court nonetheless gave significant weight to imperfect entrapment, made a finding that it was present, and granted a six-level departure in the sentencing guidelines.

The Court of Appeals rejected the defendant's argument for dismissal based on outrageous government conduct and entrapment as a matter of law, conducting an extensive analysis of the predisposition and the inducement elements of that defense, and the five factors which must be considered when analyzing the predisposition prong. The court scrutinized the prodding employed by the "hit man," and concluded that it was a "close call" whether the defendant had met the inducement element, but upheld the district court's rejection of the entrapment defense because there was sufficient evidence to support a finding against McClelland on three of the five factors relevant to predisposition.

Then turning to the government's appeal of the sentencing departure, the court found that imperfect entrapment as departure was justified even though McClelland initiated the murder for hire scheme. It found that such predisposition did not foreclose a departure because, unlike the trial defense, it is not predicated on government misconduct or deterrence of government misconduct. *Id.* at 725–26. And it held that for imperfect entrapment, the most important of the five predisposition factors was whether the defendant showed any reluctance.

20

The Court tied its reasoning to the purposes of sentencing stating that imperfect entrapment "may show that the defendant is 'both less morally blameworthy than an enthusiastic [defendant] and less likely to commit other crimes if not incarcerated.'" *Id.* *quoting United States v. Garza-Juarez*, 992 F.2d 896, 913 (9th Cir. 1991). It stated:

> A district court could properly determine that a defendant who first proposed an illegal scheme, but who later expressed serious reservations and acted only after strong and repeated inducements by the government is less morally blameworthy and less likely to commit crimes in the future than a defendant who eagerly participated in an illegal scheme with no inducement other than the initial suggestion by a government agent. Thus, if a district court departs downward on the ground of imperfect entrapment in a case in which the defendant first approached the government, the departure may still be completely consistent with at least two important factors relevant to sentencing-protection of the public, and characteristics particular to the defendant's culpability.

*Id.*

Because the issue here is sentencing mitigation, the analysis will focus on those elements of entrapment identified by *McClelland* as most significant to the imperfect entrapment departure. Those include the government inducements, the nature of those inducements, Mr. Cox's reluctance in the face of those of those inducements, and how these facts relate to morally blameworthiness and future danger.

### A. Background to the Involvement of Informants Bill Fulton and J.R. Olson

FBI concern about Mr. Cox began with speeches he made in Montana in November 2009, in which he described the Alaska Peacekeepers militia as comprising 3500 men and military type tactical equipment. *See* Ex. 4 at 7–8. Despite this concern, early in the investigation the FBI believed that Cox's claims were "likely fictitious," that his militia credentials were "dubious," and that "established militia-related leaders" in Montana had rejected his "Solution" speech. Ex. 5; Ex. 6 at 2–3. Nevertheless, the

government was sufficiently concerned that it opened a formal investigation into Mr. Cox in February 2010. Dkt. 625 at 11.

Given Cox's outrageous statements, and the number of people who had attended his events, the FBI had legitimate concerns and explored various methods to pursue an investigation of Mr. Cox. When Mr. Cox was charged with domestic violence involving his wife in February 2010, the FBI saw an opening that "present[ed] a variety of potential opportunities for the gathering of intelligence and prevention of violence." Ex. 6 at 2. On March 25, 2010, an intelligence meeting was held at the FBI Office in Anchorage, where AUSAs Bottini and Cooper opined that Cox had not "crossed a line" to the point of issuing subpoenas or national security letters. Ex. 7.

Shortly thereafter, Bill Fulton and J.R. Olson were inserted into the investigation as informants. Dkt. 632 at 79; Dkt. 636 at 172. Before Fulton and Olson became operational, some in the FBI continued to express doubt about his influence and whether Cox posed a threat. On April 30, 2010, Special Agent Milne wrote "Cox has lost most of his local support, except for a handful of guys associated with the Alaska Peacekeepers Militia. 2ATF and the local right wing media are doing their best to distance themselves from him." Ex. 8. Despite Cox's loss of support and their expressed uncertainty, if not misgivings, about the threat that he posed, the FBI moved forward with informants Bill Fulton and J.R. Olson. Both Fulton and Olson would receive substantial monetary benefits for their work. The full extent of the payments they received was not revealed until after the trial, sentencing, and appeal in this matter. *See* Sealed Ex. C.

Most of the money received by Fulton and Olson was in large lump-sum payments on February 8 and 10, 2013, after the defendants had been convicted and sentenced. *Compare* Dkts. 632 at 88–89 and 638 at 137 *with* Sealed Ex. C. Both informants likely knew during their work as informants on this case that the amount

ultimately paid would be in part based on the success of developing a case for the most serious offenses, and those payments would be withheld until after indictment, prosecution, and trial. J.R. Olson acknowledged as much in his trial testimony. Dkt. 634 at 159–62. Olson, who also benefited by avoiding criminal prosecution on an unrelated matter, and who anticipated help with a restitution obligation on yet another criminal matter, testified that he hoped to ultimately be paid up to $300,000. He also testified that in early January, 2011 he was specifically informed by the FBI that he had the opportunity to earn a substantial amount of money. Dkt. 634 at 161–62. J.R. Olson knew of this monetary incentive before the 2-4-1 discussions which began in early February 2011.

Both Fulton and Olson were signed up as informants on this investigation in May 2010. Exs. 9, 10, 11. Fulton and J.R. Olson's involvement spanned from early June 2010, when Fulton travelled to Fairbanks, met with Cox, and threatened him for not having a "plan," to just before the arrest of Cox on March 10, 2011, while J.R. Olson was having almost daily contact with Cox and kept bringing up and pressing the concept of 2-4-1.

**B.    Inducement and Threats by Fulton and Reluctance by Cox**

In March 2010, an FBI agent wrote that Cox's domestic violence arrest involving his wife Marti presented an opportunity to gather intelligence and to perhaps prevent violence. Ex. 6. It was that arrest which spawned the Alaska Office of Children's Service (OCS) to look into the welfare of Cox's son S., Dkt. 627 at 81–82, Dkt. 630 at 196, and Cox's concern that OCS would attempt to remove S. from the family home. On May 26, 2010, FBI Agent Klein recommended that Bill Fulton, an Anchorage bounty hunter and the owner of the Drop Zone, a military surplus store, be inserted as an undercover informant. Ex. 9. Agent Klein noted that Aaron Bennett, the owner of Far North Tactical, a sporting goods and survivalist supply business in

Fairbanks, had invited Fulton to set up a table and booth for an event at that store where Cox would also have a booth set up.[8] Agent Klein stated that Fulton could also "arrange for a dinner with Cox while in Fairbanks." Ex. 9. Agent Klein's plan was to insert Fulton into the investigation so he could then take a "step back and let the relationship grow." *Id*. As described below, that plan failed when, instead of stepping back and letting the relationship grow, Fulton went far off script by emphasizing his ability to bring violence, threatening Cox and Zerbe with violence because they had "no plan," defying FBI rules by surreptitiously recording Cox and others without FBI permission, later doing the same with one of the FBI agents, and then destroying the two-hour recording which captured conversations of Fulton with others at both the Pike's Landing motel meeting and the next day's meeting at Blondies. Dkt. 638 at 160–64, Dkt. 641 at 239–40.[9]

In June, when Fulton first met with at Cox the Pike's Landing Motel, he attempted to take advantage of Cox's concerns about OCS and his son S., by bringing up the topic almost immediately upon Cox's arrival at the motel room:

> Fulton: What the fuck is going on? Last time I talked to you you were waiting for a warrant.
>
> Cox: Inaudible
>
> Fulton: "No they were going to come to your house and take your kid."

Ex. 12 at 3.

---

[8] Fulton and Bennett were "really close friends," were both bounty hunters, and had a personal and professional relationship. Dkt. 639 at 110–12. Bennett, who was in Fairbanks, was in a position to gather information about Cox and pass it along to Fulton, who lived in Anchorage.

[9] Because the surreptitious recording of the FBI agent—in which Fulton played sections of the earlier recordings at Pike's Landing and Blondies—was preserved, only those portions selected by Fulton were later available for review. Fulton's undisputed attack on Les Zerbe, and Zerbe's comment that they had "no plan," was not played for Agent Espeland and thus not preserved in the recording of the meeting with Espeland.

The next day at Blondies, Cox showed up late for the meeting orchestrated by Bennett for Fulton. By the time Cox arrived with S., his one-and-a-half-year-old son, Fulton was intoxicated, bragging about the violence he could inflict. He pressed Cox on having a "plan" to obtain the warrants and line up support so that he and his violent crew could execute those warrants by arresting state court judges and others. Fulton confronted Cox about having a "plan," but Cox was confused about the purpose of the meeting. Dkts. 629 at 83, 641 at 33. Cox was not endorsing a plan to arrest judges. Dkt. 629 at 83–6, Dkt. 638 at 86–9, 219–20, Dkt. 639 at 123–25. Nevertheless, Fulton wanted Cox to talk about the "plan" they had purportedly discussed the day before at Pike's Landing to go after judges, but when Les Zerbe, who had been present the day before at Pike's Landing, insisted there was no plan, Fulton "came at [Zerbe] with a knife [and] assaulted [him]." Dkt. 638 at 150–52, 88, 92. Consistent with Fulton's behavior that day, Anderson described Fulton as "extremely gruff, a fat drunkard, rude, extremely violent," and belligerent toward Cox. Dkt. 629 at 81. At trial, Fulton admitted having a knife, but denied pulling it. He acknowledged that he wanted Zerbe and others to believe he had a knife and believe that the threat was real. Dkt. 638 at 151–52. He had portrayed himself as a man prone to violence and was described by his good friend Aaron Bennett as habitually carrying a firearm at his hip at all times with a round racked in the chamber and the hammer back. Dkt. 639 at 121. Consistent with Fulton's desire to create an atmosphere of danger and anxiety at the Blondie's meeting, he exerted control by taking everyone's cell phones and having his assistant stand guard with a sawed off shotgun. Dkt. 639 at 122. Mr. Fulton was purportedly under direction and control of Special Agents Klein and Espeland, but neither agent was present in Fairbanks during the time of these events, and Agent Sutherland, who was assigned to Fairbanks, was not working that day. Dkt. 637 at 71–74.

After the Blondie's incident in Fairbanks in June 2010, Fulton had no personal contact with Cox, and limited phone and text communications. However, in early February, 2011, Cox asked Vernon and Olson to attend the Anchorage militia convention, in part because he did not wish to be near Fulton and because his wife had just given birth to his daughter B. Fulton met with J.R. Olson and Lonnie Vernon during the convention, and told them he had been serious about wanting to kill Zerbe and stated:

> MR. FULTON: I was going to fucking end his existence on this planet. Yeah, I was not fucking around at all. What happened was -- that was last summer when Schaeffer didn't know which way it was going to go with the cops, whether or not they were going to come try to take his kid.
>
> ***
>
> And [Zerbe's], like, well, we don't have a plan. I just fucking lost it. I literally grabbed a knife, started coming over the counter, and I was, like, I'll fucking slit your throat open (inaudible) you fucking piece of shit. What do you mean you don't have a fucking plan? I was, like, that's all you guys do is fucking plan. What the fuck is your plan? Well, we thought you guys would have one.

Ex. 13.

Cox had earlier told Vernon and Olson to be wary of Fulton, describing him as a "brutish guy" who needed someone "temperate" like Cox. Ex. 14 at 4–5.

Thus Cox was not only afraid of Fulton, he pushed back against Fulton's threats to establish a plan of action involving OCS and instead ultimately followed lawful procedures to resolve that dispute.

## C.     Inducement by J.R. Olson and Reluctance by Cox

The indictment alleged that on February 12, 2011, Cox and others, anticipating Cox's plan to not attend a court hearing, had developed a "2-4-1 plan" that if any of them were killed, the others should kill two opponents, specifically law enforcement, judges, or district attorneys. Dkt. 239 at 10–11. J.R. Olson consistently pushed the 2-4-1

26

concept, bringing it up on a routine basis, even after being admonished by the FBI in response to AUSA Skrocki's complaint about Olson.

The genesis for this 2-4-1 discussion was likely Olson and Vernon's conversations with Fulton at the militia convention at the Millenium Hotel in Anchorage on February 5, 2011. Dkt. 632 at 179–80, Dkt. 632 at 197. Olson remarked that "we need to make it clear that he [Cox] needs to have a plan" if he was not going to appear in court. Ex. 15 at 15. Vernon said Cox was saying he was "just not going to go," but Vernon wondered, "then what?" *Id*. at 17. Olson implied that Cox would be "gone" once arrested, meaning killed. *Id*. After returning from Anchorage, Olson met with Cox on February 6 at a Super Bowl Sunday gathering. Olson claimed the meeting was unrecorded because his recorder malfunctioned, Dkt. 633 at 13. Cox testified that Olson brought up the "Israeli" policy of "one for one," or "141"—that for any one Israeli killed, one member of the enemy would be killed—and that it was Olson who wanted to inject this concept into the discussions with others in their group. Because Olson had met with Fulton the previous day, Cox perceived him to be supporting Fulton's violent tendencies, and was deeply alarmed. He expressed to Olson his opposition to a 2-4-1 plan, but said he would bring the issue up at the next meeting. Dkt. 641 at 75–76. Olson testified that it was Cox who first brought up 2-4-1 and that it was first raised at the February 12 meeting in Ken Thesing's bus. Dkt. 632 at 175–76, Dkt. 633 at 24–25.

While Cox is prone to exaggeration, his testimony that the 2-4-1 issue was raised by Olson on February 6, six days *before* the Thesing bus meeting, is corroborated by Olson's statement in Anchorage on February 5 that they needed to "make it clear to [Cox] he needs to have a plan" if he is not going to appear in court. Cox brought up the Israeli defense policy on February 12 as one item on a list he wanted discussed, and he testified it was on that list based on Olson's raising the topic from the previous day. The

almost academic nature of the discussion of this topic on February 12 is consistent with a topic suggested by Olson, and brought to the table by Cox.

However, even if one were to accept Olson's testimony that Cox first brought this up, it was Olson who continually pursued discussion of 1-4-1, 2-4-1, and even suggested 5-4-1. And it was Olson who tried to prod Cox into turning this concept into a concrete plan with directions for himself and others in the group. The facts on this point were well developed in Mr. Cox's first sentencing memorandum, but those facts were not linked to the imperfect entrapment departure ground argued here. Dkt. 543 at 11–18. It bears emphasizing that even the government was troubled by the actions of Olson:

> From: Skrocki, Steven (USAAK)
> Sent: Sunday, February 13, 2011 4:13 PM
> To: Loeffler, Karen (USAAK)
> Subject: Cox-(long email--sorry)
>
> Listened to conversation from last night. In summary, they are kicking around ideas. My advice, do not arrest if him he doesn't show, but issue the warrant and let it sit. With the source in place, we'll have the best idea of what's going on, and it won't agitate Cox's followers---you might want to give Mike Grey and the S A C a call tonight too. The SAC can verify with Rick what I'm saying—
>
> "241" stands for, if they take one of us, we take two of them. But they discuss not being strong enough to impose their views on the rule of law. They discuss everything from 2 4 1, to fleeing, to the rapture coming and waiting for that. In my view, *the FBI source is pushing Cox a bit too hard* on not getting arrested, and the source agrees too much in moving their plans forward which would generate a response, whether violent or not. The source adds, "why don't we make it 5 4 1" (not a good idea, FBI has to fix this)
>
> After some discussion of "2 4 1", Cox says, "we're just speculating here and I want to hear where you stand". Cox does say he would be morally correct in shooting a judge, but adds that he doesn't want to do that. So he makes the big pronouncement, then backs off. The typical, *"I will......but not just yet"* type stuff.

28

Ex. 16 at 1 (emphasis added).

This concern about Olson's behavior was communicated to Olson by Agent Sutherland who "cautioned [Olson] to not try to elicit evidence or try to (sic) hard to make a case," and "was reminded that his tasking was to collect intelligence and to report the plans and thoughts of the group without unduly influencing the group." Ex. 17.

Olson's continual prodding on this theory is relevant to the imperfect entrapment departure. In a February 15 conversation with Cox and Vernon, Olson raises 2-4-1 saying "we need some kind of—some kind of code, …241 code." Ex. 18 at 5. On February 19, the same day that Sutherland reports that he had admonished Olson, Olson raised 2-4-1 with Cox at Coleman Barney's house: "At what point do—do—do—the 241 kick in?" Cox downplays 2-4-1, showing reluctance, and also commenting "I'm hoping Lonnie was just kidding, blowing off some steam or something." Ex. 19. After more discussion from Cox about his plans to flee and how he is no longer a leader, Olson comments that "it may be our turn to jump in the hot seat," and asks what else he can do "that 241, I'd—I'd be willing to, you know, to do something like that…if need be to get some attention...." Ex. 20 at 8. Cox shows reluctance by saying it would do no good for them to die just because he went to prison, but Olson persists by commenting "I'd rather die a—die a free man—than being in bondage with them." *Id.* at 10–11. Olson pushed on 2-4-1 for a third time on February 19. In response to Cox cautioning that they all have a lot to lose, that they primarily care about their families and businesses, that he is not motivated by seeing heads role, that he is motivated by wanting his family to "live a free and prosperous and happy life," and that 2-4-1 did not make sense at that time, Olson steers the conversation to "what happens when—they start grabbing us one-by-one?," and wants to know if 2-4-1 is then initiated by those who are still outside, how do we determine

29

when the scales are tipped? *Id.* at 20–23, 26. The discussion continues with no resolution other than Cox clearly taking the position that 2-4-1 was premature.

While not directly relevant to Olson's prodding, Cox's reluctance to pursue violence is further demonstrated by comments and concerns he expressed on February 12 about Aaron Bennett trying to create a wedge between him and Thesing:

> MR. COX: . . . he's [Aaron Bennett] constantly pushing me, you've got to just fight and start the killing, you know, and figure it out later, you know, and I'm being very temperate and, no, hold back, let's not be premature, you know, that's just retaliation, that's just vindictive, you know, oh, Nelly, whoa, Nelly, pump your brakes, you know?
>
> MR. OLSON: Put the reins on.
>
> MR. COX: And he gets sick of me saying pump your brakes too much and now I think where he's at is **he's trying to destroy me because I'm a cork in a bottleneck.**

Ex. 21 (emphasis added).

Bennett was a close friend of Bill Fulton who had both a business and personal relationship with Fulton. He helped Fulton set up the meeting with Cox in June 2010.

## D. Cox's Decision and Preparations to Flee as Powerful Evidence of Reluctance

The government will argue that Cox's decision to pack up his family and all their belongings and to escape Alaska was a temporary move because Cox had stated that he intended to return and fight "guerilla warfare" at some later date. This view contradicts the numerous emails and memos over the entire course of this investigation in which prosecutors and agents openly mocked most of Cox's claims. Those reports noted that he had little to no support in the militia community, and that he had developed no concrete plans for action. Ex. 5 (Cox's claims are likely fictitious), Ex. 7 (AUSAs opine that Cox has not "crossed the line), Ex. 8 ("Cox has lost most of his local support"), Ex. 22 (Cox was exposed as a fraud, took a beating and "lost all of his

30

support in AK, Idaho and Montana"), Ex. 16 (AUSA Skrocki: "Cox is full of it," "he's a legend in his own mind," "Cox is self-absorbed, narcissistic, and an emperor with no clothes," "I don't know if this sums this group up, but it's not the stuff of revolutionaries."), Ex. 23 (Sutherland reports he listened to most of the February 12 audio, and states "DO NOT feel it will support prosecution," and recommends holding the agents in Anchorage until they can discuss the matter further).

Cox and his family moved out of their house on February 13, 2011, and moved in with the Vernons. On February 14, Mr. Cox failed to appear for his minor court hearing in state court and began preparations to flee Alaska with his family and their belongings. By February 15, the FBI learned of Cox's plans to flee. At that point they had already budgeted for a substantial TDY of FBI agents for Fairbanks. In an email from Agent Sutherland, he stated they expect Cox to flee in 24 to 48 hours: "Sooooooo…we have lots of legal and strategy questions." Ex. 24. On February 20, 2011, United States Attorney Karen Loeffler discussed a plan to provide a truck and driver to take Cox across the border into Canada. Ex. 25. On February 21, 2011 the FBI learned Cox was liquidating everything he owned. Ex. 26. By February 26, 2011, the FBI knew that Cox "was fatigued and ready to go," "ready to leave w/ trucker" and that he was also making "wanted posters of himself as Robin Hood," presumably to leave behind. Ex. 27.

After Lonnie Vernon angrily kicked Cox and his family out of his house on February 19, Cox, his wife, and his two children moved in with Coleman Barney and continued with their plans to flee Alaska with all of their belongings. From this point forward until the orchestrated grenade and silencer transaction and the arrests on March 10, J.R. Olson was working both the government's fictitious plan to assist in Cox's escape with trucker "Hans Solo" and brokering the deal for the purchase of some hand grenades and silencers that Bill Fulton claimed he could supply. Olson was also

31

pushing Lonnie Vernon to buy "a neat toy" from Fulton. Ex. 28 at 8. And it was Olson who placed the weapons order with Fulton directly by phone on February 26, 2011. (Untranscribed audio: 15300_3-11-11(3)18.57.56(26.02.11).)

E. **The Evidence of Imperfect Entrapment Is a Mitigating Factor Establishing Mr. Cox Is Less Morally Blameworthy and Less Dangerous than Someone Who Would Eagerly Pursue an Agreement and a Plan to Kill Federal Employees.**

A defendant who ultimately expresses serious reservations about illegal conduct he may have initially proposed, or even pursued, is "less morally blameworthy and less likely to commit crimes in the future." *McClelland*, 72 F.3d at 726. This departure fits Mr. Cox. When this offense is alleged to have begun, Mr. Cox was a young man with no history of violent behavior. He had been employed or ran his own businesses since he was a teenager. He ran for public office and lost. He then began making speeches to militia and Second Amendment groups in Alaska and elsewhere. He made up facts, and exaggerated the size of his militia and the equipment he had to support it. Initially, he drew large crowds, but eventually he lost support in Alaska and elsewhere when it became apparent that he was a "bullshitter" or, as described by AUSA Skrocki, the "emperor with no clothes." He continued to make outrageous statements and comments, even in a state court hearing, which he turned into a publicity stunt telling a judge that some people would not have a problem seeing the judge dead and telling a court security officer he had them outgunned. He also travelled wearing a bullet proof vest and carrying a concealed weapon when giving a speech at a radio station and visiting with a police officer who was a former neighbor. For these and other reasons, federal and local law enforcement understandably became concerned and pursued their investigation of Cox.

Character and reputation, as a factor relevant to the predisposition prong of entrapment or imperfect entrapment should be viewed with respect to predisposition to

commit the most serious crime of conviction—conspiracy to murder federal officers and employees. Mr. Cox had developed a reputation among the militia community as a blowhard, not as a man of action capable of committing violence, and while that is not a character trait to be trumpeted, that character is inconsistent with a person who is likely to take action or be able to lead others into action.

Most significantly for a departure based on imperfect entrapment, it is the factors of inducement, the nature of that inducement, and reluctance in the face of such inducement which are most relevant to moral culpability and future dangerousness.

Despite Mr. Cox's outrageous speeches and bombastic comments suggesting violence, in conversations with Fulton, Olson, Barney, and the Vernons, he repeatedly pushed back against calls to action or for concrete plans to commit violence. He demonstrated reluctance throughout the time of this alleged conspiracy—reluctance about suggestions of violence made by the informants, by Aaron Bennett, Fulton's friend, and others allegedly involved in this conspiracy.

His reluctance is also demonstrated by his decision to take his family to Fort Wainwright to seek asylum, rather than engage in a violent confrontation with law enforcement. Ex. 29. Cox, apparently believing he was the target of a fictitious federal hit team, showed reluctance at resorting to violence, and instead sought protection at Fort Wainwright. Whether one views this event as a sincere concern for his safety and the safety of his family, or a form of political theater, it demonstrates reluctance to engage in violence.

Between June and November, there were no specific plans to commit violence against any particular target. On November 19, 2010, there was a militia event attended by J.R. Olson, to discuss publicity to the press and security for an upcoming state court hearing and at KJNP radio station. Ex. 30. The entire security plan was to be defensive in posture and to only use force in self-defense. Cox made comments again

demonstrating reluctance to use physical or violent force: "it would be horrible to kill a cop." *Id.* at 6. Cox stated that they would need to be prepared to kill in defense of Judge Bartel or Marti, but when J.R. Olson interjected "Yeah, be ready to--," Cox interjected with "we would want to avoid [killing] at all costs." *Id.* at 8.

In an earlier portion of this recording, a section not played for the jury, Cox stated "the reason that we need to do this is not so that we can go off and, you know, pick a fight and start bloodshed, but so that we can prevent it. I mean none of us want anything except to, you know, watch cartoons with our kids, and make the lawn look nice, and go fishing, and, you know, have a good time, you know, that's – we just want domestic tranquility like it says." Ex. 31.

Cox also showed no interest in M16 rifles when suggested by Olson, Dkt. 634 at 117, and at other times made statements like "bluff it, pray, and train…[a]nd in the meantime, total Gandhi," Ex. 2 at 41, and "Grenades scare me," *id.* at 45. In sum there is far greater evidence of reluctance displayed by Mr. Cox throughout the time of this conspiracy than that found to exist in *McClelland,* which justified a six level downward departure.

## IV. Mr. Cox's Mental Health and the Court's Concern About Future Dangerousness

### A. The Court Was Misled by the Psychological Evaluation Presented at the First Sentencing Hearing

At Mr. Cox's original sentencing, the Court expressed strong concern about Mr. Cox being dangerous, stating his "personality and mental status as described [by Dr. LaDue] indicates to me that the public needs to be protected from him," finding that the results of Dr. LaDue's psychological exam were "pretty accurate," that "Mr. Cox needs continuing long-term medical care," and that the Court was "not at all satisfied that he would get that outside of . . . incarceration." Dkt. 605 at 60. At that time, the Court had before it the inaccurate and misleading psychological evaluation prepared by

34

Dr. Robin LaDue, which concluded that he was paranoid schizophrenic and needed to be medicated. Dkt. 543-2 at 13, 18–20, 23. The diagnosis and treatment recommendations from that report have now been debunked by both BOP mental health professionals and the thorough psychological evaluation prepared by Dr. Mark Cunningham. *See* Ex. 32; Sealed Ex. A; Sealed Ex. B.

Dr. LaDue had diagnosed Mr. Cox as paranoid schizophrenic and suffering from delusional personality disorder and paranoid personality disorder. She concluded that "Mr. Cox needs mental health treatment for the rest of his life," "needs to be monitored closely to ensure he is taking the appropriate medication," and that he is a "man with a severe mental illness." Dkt. 543-2 at 23; *see also id.* at 12–13, 22. None of these conclusions are supported by BOP mental health professionals or Dr. Cunningham.

The dangerousness concerns expressed by the Court at the first sentencing are understandable given the report prepared by Dr. LaDue. But the basis for those concerns are no longer supported because Dr. LaDue's diagnosis and recommendations are simply wrong. Her findings and recommendations are not supported by the facts of this case, witness interviews, reports about Mr. Cox since he was sent to prison, or the diagnostic manual.

Mental health records from BOP for Mr. Cox's stay at both FDC SeaTac and the Marion CMU completely reject Dr. LaDue's diagnosis. BOP mental health professionals have not required or recommended mental health treatment as suggested by Dr. LaDue. Upon arrival at the Marion CMU, Dr. Marla Patterson, a BOP psychologist, reviewed Dr. LaDue's report, met with Mr. Cox, and wrote the following:

> Inmate COX was the subject of a psychological evaluation requested by the defense attorney. See attached report. The conclusion of this evaluation was diagnoses of "Axis I: Paranoid Schizophrenia, Axis II: Delusional Personality Disorder and Paranoid Personality Disorder." The accuracy of these diagnoses is questionable (noteworthy is that there is no Delusional Personality Disorder listed in the DSM). The information

35

provided might be better accounted for by understanding the cultural context of his behavior, given he was associating with, and strongly identifying with a group of militant individuals. COX has no other reported mental health history, treatment or psycho-pharmacological medication use.

Sealed Ex. B at 11. She also wrote "No programs/treatment are recommended at this time." *Id.* The additional mental health records provided by BOP are consistent with the views expressed by Dr. Patterson. Dr. Cox is not involved in mental health treatment or medication, and neither medication nor treatment have been recommended for him.

Dr. Cunningham's thorough and well-documented report supports the conclusions reached by the BOP mental health professionals, and sets forth in detail why the diagnoses of Dr. LaDue are not supported by any objective or psychologically sound analysis. Sealed Ex. A at 6–9.

Dr. Cunningham reaches diagnostic impressions about Mr. Cox but concludes that he does not suffer from the severe mental illnesses identified by Dr. LaDue and that Mr. Cox's psychological problems do not make him dangerous and do not require lifetime treatment. *Id.* at 32–34. With respect to medication, Dr. Cunningham, like the BOP, does not see a present need. But he notes that if Mr. Cox's "cyclic mood disorder," which is mild at present, resurges, it is treatable with mood-stabilizing drugs. *Id.* at 32. None of Dr. Cunningham's findings rise to the level of concern that the Court identified at Mr. Cox's first sentencing, and neither Dr. Cunningham nor the BOP suggests a need to manage mental health issues for Mr. Cox in a custodial setting.

It is undisputed that, other than the domestic violence episodes with his wife, Mr. Cox has never attacked, assaulted, or physically harmed another human being. To the extent that dangerousness concerns about Mr. Cox center on his past inflamed rhetoric and a concern that he will incite others to unlawful action, one must dig deeper into the record and the discovery to see that those concerns are undermined by views expressed by government agents, by Mr. Cox's reluctance whenever pressed into

36

making a plan for action, and his decisions to seek asylum or flee from Alaska when he felt that he was under imminent threat of danger.

## B. Concern About Mr. Cox's Ability to Influence Others

The discovery materials reveal that the FBI not only had doubts about Mr. Cox's militia and ordinance claims, they also doubted his ability to influence others. On April 30, 2010, before the informants were even introduced to Mr. Cox, Special Agent Milne wrote: "Cox has lost most of his local support, except for a handful of guys associated with the Alaska Peacekeepers Militia. 2ATF and the local right wing media are doing their best to distance themselves from him." Ex. 8.

After Cox's meeting with FBI informant Bill Fulton in June 2010, in which Fulton threatened Cox about not having a "plan" and pulled a knife on Les Zerbe, Special Agent Espeland wrote an email to other agents that Cox "took a verbal beating at the general meeting last night. Most likely lost all his support in AK, Idaho and Montana. Any plans for 'revolution' took a giant step back." Ex. 22. And when asked why Cox took a beating, Agent Espeland responded, "Sc was exposed as a self agrandizing fraud. He did not have a 'plan' at all. Even if he had a plan there were allegedly other plans to off SC 48 hrs after the revolution began. SC has gone from a cadre of 24 down to 2 (Him and his #2, Les Derby)." *Id.* By February 2011, interest in Cox's speeches, and his influence on his coconspirators, had waned. There are repeated references to these facts in the email traffic among the FBI agents and AUSA Skrocki, with Mr. Skrocki hitting the nail on the head when he described Cox as the "emperor with no clothes." Ex. 16 at 2.

Mr. Cox was also losing sway over his followers. Lonnie Vernon was fed up with Cox, and with Cox's reluctance to take action, and on February 19, two weeks before the arrests, he kicked Cox and his family out of his house, requiring Cox to move in with Coleman Barney while awaiting "Hans Solo," the trucker retained by J.R.

Olson, to spirit Cox out of Alaska. Vernon attacked Cox telling him "Stand up for yourself," and "you never have your ducks in a row," Ex. 20 at 2–3. After this February 19 falling out with Lonnie Vernon, Cox had very little contact with Vernon, while Olson continued communicating with Vernon on a regular basis.

Based on the undercover recordings played at trial, Olson was brokering separate deals for weapons between the Vernons and Fulton, and Cox and Barney and Fulton. The controlled deliveries of the weapons, and the arrests which followed, were also separately orchestrated. This separation is further evidence that Cox had lost influence over Vernon, and that the Vernons were now acting separately and apart from Cox and Barney.

### C. None of the Federal Employees Identified by the Government for the Conspiracy to Murder Charge Were Placed in Actual Danger of Physical Harm.

In a January 18, 2011, FBI budgeting memo for a 90-day TDY assignment of agents from Anchorage to Fairbanks, and a request for funding for four confidential human sources (CHS), it states that "Cox has not specifically threatened law enforcement officers in the Fairbanks area, he has indicated that 'blood may be shed' in the future." Ex. 33 at 2.

A name search of the almost 12,000 pages of transcripts created from the undercover audio reveals no mention of Nanette Curtis, Tom Studler, Trina Beauchamp, or Jimmy Johnson, the four names found buried in Michael Anderson's legal pad and field notebook amongst writings and entries completely unrelated to this matter. Exs. 34, 35. And as Anderson testified, he did not follow up investigation on any of these names, and the names were entered well before the arrests of Cox and others. There is no evidence in the record or elsewhere suggesting that any actions were about to be taken against these federal employees unless at some undefined point in the

future the United States devolved into Stalinesque martial law, and they participated in breaking down doors and making mass arrests.

While the four names on trial exhibits 504 and 506 represent the basis for Mr. Cox's conviction, those names were never a point of discussion among Barney, the Vernons, Olson, Fulton, or Bennett. The names were not even discussed between Anderson and Cox in any concrete fashion. Jimmy Johnson was unknown to Cox, and his name went into the field manual solely because Anderson saw the name in a news article and considered researching him in connection with the fictitious federal hit team which Cox had conjured up. Dkt. 629 at 120–21; Ex. 35.

The TSA agent names were provided by Mr. Cox and written down on a legal pad, buried among other pages of unrelated writings, and forgotten by Anderson, only surfacing when the search warrants were later executed in March 2011. Dkt. 629 at 114–17; Ex. 34. Cox made a comment in relation to Trina Beauchamp that was generally related to her participating in the unlikely advent of Stalinesque martial law. Anderson conducted no research on those names.

### D. Mr. Cox's Outrageous and Offensive Statements

Mr. Cox, at a misdemeanor hearing in state court, appeared with a security team and 36 supporters. He commented to the state court judge that some people—those that should be kicked out of the militia—would rather kill you than argue with you in court, and then as he was leaving told a court security officer "you're outmanned and outgunned and we could have you all dead in one night." Dkt. 636 at 122; Dkt. 642 at 183–84. Coleman Barney testified that Cox went "off script" and shocked everyone. Dkt. 642 at 183–84. Agent Sutherland reported that there were 36 supporters there for Cox, and that everyone left without incident. Ex. 36. His lack of insight about the effect of such comments is demonstrated by text he later sent to Phillip Brandon that the

officer to whom he made the comment was a "cool guy" who is "totally on our side." Ex. 37.

Cox also had verbal exchanges with TSA officials, including Tom Studler, at the airport, asking to speak with a supervisor about his constitutional concerns. But it was also reported by some in the TSA that he left the airport with "no problems," that his demeanor "was pretty respectful[ ]," and "[a]t no time during the private screening did COX make any threats." Ex. 38. Nevertheless, these unnecessary conflicts with low-level security personnel demonstrate the lack of insight and attention-seeking behavior discussed at various points in Dr. Cunningham's report. Sealed Ex. A.

### E. Cox's Ability to Find Pro-Social Avenues to Address Conflict and to Discern More Meaningful Solutions to Problems

At the trial, Mr. Cox was portrayed as a militia leader, sovereign citizen, and person who would not employ normal channels of dispute resolution. However, Mr. Cox has demonstrated the ability to work within the system with proper education, guidance, and support, and to resist those who advocate violence. An example of this is how the OCS investigation involving his son S. was ultimately resolved. Most importantly, Cox resisted Fulton's entreaty to create a plan for violence and instead worked through his attorney Robert John and with OCS to ultimately resolve the matter amicably with the family and a psychologist. Dkt. 630 at 197. He accepted counsel from both his lawyer Robert John and from Military Police Officer Steven Gibson, who had reached out to Cox when he feared that law enforcement and Cox may be heading to a confrontation. Dkt. 638 at 253–55. Gibson testified that he shared with Cox his similar experiences with OCS and recommended a psychiatrist to work with Cox, S., and OCS, and that helped resolve the problem. *Id.* at 256. This clearly demonstrates Cox's ability to listen to reason.

At some point during the period of the conspiracy, Mr. Cox came under the influence of the sovereign citizen movement and had meetings with various individuals in that movement over litigation strategy, creating their own court system, and taking it to the point of having a "trial" of his domestic violence case at the Denny's Restaurant with the faux Judge Bartels. While concerning, some of the reliance on these individuals can be seen as a method for avoiding violence. More importantly, since then Mr. Cox has disavowed the sovereign citizen movement and determined that their ideology and tactics were false and did not work. Ex. 39 at 3. This is confirmed by Dr. Cunningham's report. Sealed Ex. A at 7, 27, 32, 34.

Dr. Cunningham identifies these factors and others related to pro-social avenues available to Mr. Cox which make his risk for committing or inspiring acts of serious violence "very low." These include his strong family support and his occupational skills.

## V. Conditions of Confinement and Danger in Prison Should Be Considered in Determining the Length of Mr. Cox's Sentence.

Once Mr. Cox was sentenced in January 2013, he was designated and housed in the Communication Management Unit, first in Marion, Illinois, and more recently in Terre Haute, Indiana. Before his sentencing, Mr. Cox was in pretrial and pre-sentencing detention in general population at FDC SeaTac. He was permitted normal contact visitation with his parents, wife, children, and siblings. Once sentenced, that all changed, and he is now imprisoned under conditions described by a federal judge as:

> Inmates housed in CMUs, by contrast, may spend years denied contact with their loved ones and with diminished ability to communicate with them. The harms of these deprivations are heightened over time, as children grow older and relationships with the outside become more difficult to maintain. *Cf. Wilkerson v. Stalder*, 639 F.Supp.2d 654, 684 (M.D. La. 2007) ("With each passing day its effects are exponentially increased, just as surely as a single drop of water repeated endlessly will

41

eventually bore through the hardest of stones.”).” *Aref v. Lynch*, 833 F.3d 242, 257 (D.C. Cir. 2016).

Since his arrival at the CMU in 2013, he has had one face-to-face visit with family members. While his continued confinement in the CMU may in part be related to his tendency to "poke the bear" as described by Dr. Cunningham, those incarceration conditions are harsh and have a severely negative impact on mental health and maintaining pro-social relationships with family. This should be taken into account in determining how long of a prison sentence is necessary for this offense, and to what degree continued incarcerations has negative effects on rehabilitation and the other purposes of sentencing.

The creation of the CMUs, how they are managed, and the decision making process in which inmates are placed at CMUs have been the subject of criticism, controversy, and litigation. See https://ccrjustice.org/home/get-involved/tools-resources/fact-sheets-and-faqs/cmus-federal-prison-system-s-experiment.

The BOP claims that the CMUs are designed to hold dangerous terrorists and other high-risk inmates, thus requiring heightened monitoring of their external and internal communications. However, many prisoners were sent to these units based on their unpopular political views, and "many of these prisoners were brought to the CMU as a calculated means to 'integrate' the units after critical press attention to the targeting of Muslims," because of the high percentage of Muslim inmates assigned to CMUs. *Id.*

The CMU has also proven to be a dangerous place for inmates housed there. The CMU at Terre Haute is small and houses fewer than 50 inmates. In Mr. Cox's time there, one inmate has been stabbed and killed by another inmate, who then seriously wounded a second inmate before being subdued by a third inmate. The attacks on the inmates appeared to be motivated by animus from Muslim inmates against non-Muslim inmates at the CMU. The person who committed the murder had a list of names on the murder weapon and another list of names on piece of paper. *See* Ex. 40.

42

## VI. Defense Objections to Probation Guideline Calculations

Our objections are set forth in the attached March 22, 2019, letter to USPO Hensel, and are summarized in Ms. Hensel's Addendum to the Final Supplement to the Presentence Report. Our objections letter is attached at Ex. 1. We rely on that letter for our objections to the two-level adjustment for role in the offense and the denial of the acceptance of responsibility adjustment. Final PSR at 3, ¶ 18, and 4, ¶ 24.

With respect to our objection to the six-level adjustment applied pursuant to § 3A1.2(b), we supplement the letter with the following argument.

### A. The § 3A1.2(b) Adjustment Does Not Apply Because Mr. Cox Was Not Motivated to Murder the Three Federal Employees on Anderson's Notepad Because of Their Status as Federal Government Employees.

The final PSR assigns a six-level adjustment to the offense level, based on the finding that "(1) the victim was (A) was a government officer or employee…**and** (2) that the offense of conviction was motivated by such status." §§ 3A1.2(a)(1)(A) and 3A1.2(a)(2); § 3A1.2(b).[10]

This adjustment does not apply because the evidence fails to establish that the "offense of conviction" was "motivated" by the federal status of the victims, but rather their potential—but never fulfilled—roles as enforcers of Stalinesque martial law. Moreover, this adjustment requires a specified victim, while the contingent conspiracy upheld by the Ninth Circuit Court of Appeals under the broad rationale that "the agreement standing alone constituted a sufficient general threat to the safety of a federal

---

[10] Previous defense counsel objected to this adjustment under a double-counting theory. Our objection is that this guideline adjustment requires far more than what is required for the offense of conviction, not that it is redundant of what the offense of conviction establishes for the base offense level. However, the reason that § 3A1.2 "does not amount to impermissible double counting" for convictions involving a single identifiable victim or group of victims is that "the Guideline requires a higher level of culpability, *i.e.*, the defendant's actions must have been 'motivated' by the victim's official status." *United States v. Woody*, 55 F.3d 1257, 1274 (7th Cir. 1995); *see also United States v. Salim*, 549 F.3d 67, 76 (2d Cir. 2008).[10] Mr. Cox clearly lacks the required higher level of culpability.

officer for purposes of liability under the statute," does not require a specified victim. No specified federal victim ever became an agreed-upon target for murder in this case. In Mr. Cox's case, § 3A1.2 further requires the "offense of conviction" to have been "motivated" not just by the official status, but by the *federal* official status of a specified victim.[11] Here, because the statute of conviction is violated *only* where there is a federal victim to establish jurisdiction for the offense, and because the "offense of conviction" must be "motivated" by such status, the analysis cannot take into account any state or local actors.[12]

The final PSR incorrectly identifies the three federal employees from Anderson's notepad (and a fourth employee, a U.S. marshal, who was not known to Cox, and whose name was a lone written entry in a separate yellow field book owned by Anderson) as official victims. PSR at 47–48; *see* trial exhibits attached as Exs. 34–35; Dkt. 629 at 114–16; *id.* at 120–21. Anderson testified that Cox had asked him to add the names in the notepad (but not the yellow field book) to his database, but he never did. The Ninth Circuit did hold that the contingent conspiracy represented by this third theory—the theory that Cox and Anderson could consult this database in the event of government collapse and Stalinesque mass arrests to identify who was carrying out

---

[11] We recognize that cases interpreting this "motivated" provision permit an enhancement when "state officials or employees [ ] are *the victims* of a federal crime." *United States v. Alexander*, 287 F.3d 811, 820 (9th Cir. 2002) (emphasis added). But *Alexander* involved the federal crime of interstate communication of threat to injure others in violation of 18 U.S.C. § 875(c), which did not require a federal victim and had interstate communication as its federal jurisdictional basis. The same is true of the cases, cited in *Alexander*, in which other circuits concluded the guideline could be applied to state officials. *See United States v. Hudspeth*, 208 F.3d 537 (6th Cir. 2000); *United States v. Stewart*, 20 F.3d 911 (8th Cir. 1994).

[12] This federal-victim restriction is confirmed by the fact that this enhancement, unlike other guidelines enhancements, is limited to the specific victims of "the offense of conviction" and excludes other relevant conduct. *See United States v. Drapeau*, 121 F.3d 344, 349 (8th Cir. 1997) ("[Section] 3A1.2(a)'s enhancement is proper only where a government official is the victim of a defendant's offense of conviction. Because § 3A1.2(a) specifies that only the offense of conviction is to be considered, the district court erred in considering other relevant conduct.").

those unlawful arrests and kill them—could give rise to liability under the statute of conviction. However, Cox and Anderson were indifferent to the federal status of these individuals (indeed, the database otherwise consisted entirely of state employees) and the conspiracy was not motivated by their employment status, but by their potential future acts: the carrying out of Stalinesque mass arrests or purges.

This adjustment is also not applicable because there is no "specified" individual victim that Mr. Cox was motivated to kill. Application note 1 to § 3A1.2 states: "This guideline applies when specified individuals are victims of the offense. This guideline does **not apply** when the only victim is an organization, agency or the government." A victim" is a "person who is directly and most seriously affected by the offense." § 3D1.2 cmt. n.2 (grouping of counts). A person who appeared on this list or database would not understand themselves to be potential murder victims unless they were planning on carrying out mass arrests at the behest of a Stalinesque government. It is completely inaccurate to say that the federal employees forgotten by Anderson and Cox at the time of their arrests were "directly and most seriously affected by the offense." From the time of the conspiracy to the present, none of the individuals named have participated in mass arrests or purges, the prerequisite for becoming an actual target of the conspiracy. Ultimately, there are no identifiable victims under the unusual circumstances of this offense—the victim is at most a hypothetical future government as an entity with no specified victims.

//

//

## VII. CONCLUSION

Mr. Cox has paid dearly for the crimes he has committed. Any further period of incarceration is not necessary to further the goals of punishment or deterrence, and further imprisonment will undermine rehabilitation.

DATED this 7th day of October 2019.

Respectfully submitted,

s/ *Michael Filipovic*
Federal Defender

s/ *Ann K. Wagner*
Assistant Federal Defender

Attorneys for Francis Schaeffer Cox

46

**CERTIFICATE OF SERVICE**

I certify that on October 7, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. I further certify I will mail a copy to Francis Schaeffer Cox.

s/ *Suzie Strait*
Paralegal