MICHAEL J. HEYMAN
United States Attorney

STEPHEN L. CORSO
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: stephen.corso@usdoj.gov

Attorneys for the Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>FRANCIS SCHAEFFER COX,<br><br>Defendant. | No. 3:11-cr-00022-001-SLG |

**GOVERNMENT'S OPPOSITION TO EARLY TERMINATION OF SUPERVISED RELEASE (Dkt. 854)**

A jury found Francis Schaeffer Cox, an anti-government militiaman and agitator, guilty of several offenses stemming from his plan to kill federal and state officials, including Conspiracy to Murder Federal Officers and Solicitation to Murder Federal Officers. This Court should decline to terminate his supervised release early.

//

//

## 1. Factual Background

In 2009, Cox commanded and led the Alaska Peacemakers Militia, an anti-government group based in Fairbanks, Alaska. (Gov. Br. at 4.)[1] Cox worked with Michael Anderson, a co-conspirator, to identify government officials to kill if the government declared martial law. (*Id.*) Cox and Anderson decided to create a list or database that would contain the names of government officials and their home addresses. (*Id.* at 4-5.) Cox provided Anderson with the names of three Alaska State Troopers and three federal officials to add to the database. (*Id.* at 5.) Cox knew one of the officials, who worked for the TSA, and told Anderson that she was a "nice lady" who went to Cox's church, but that "one day she may just follow orders, and she may have to go." (*Id.*) On a page in Anderson's notebook reflecting some of the information for the database, Anderson wrote "Federal Hit List" at the top, then wrote the name of a deputy U.S. Marshal. (*Id.*) The database included the officials' home addresses and other identifying information. (*Id.* at 6.)

Cox also confronted federal employees. Cox phoned the TSA employee noted above, whose house he had once visited for lunch while wearing body armor, and asked whether he had been placed on the no-fly list. (*Id.* at 6.) After she declined to answer, Cox added her to his "hit list." (*Id.*) Cox berated a DHS employee while she was at a local store with her daughter. (*Id.*) Cox told her that he did not like to see "a lot of Feds" in

1 The facts and procedural history are drawn from the government's answering brief in Cox's third appeal, *United States v. Cox*, No. 23-2713, Dkt. 16 (9th Cir. May 13, 2024), which relied on the government's answering briefs in Cox's earlier appeals.

Fairbanks, had a few-thousand-strong militia, and that he did not believe that the DHS was a "legally formed department within the government." (*Id.*) Cox added her to his hit list. (*Id.*) Cox also approached two TSA employees at the Fairbanks airport and called them "Nazis." (*Id.*) He followed one outside the airport and, coming up close behind her, took a picture of her "to know who the Nazis are." (*Id.* at 11-12.) When the TSA Federal Security Director approached Cox at the airport, Cox was "confrontational." (*Id.* at 12.) Cox added his name to the hit list. (*Id.*) Cox later declared that if the TSA "did something to his family," he would burn down the TSA agents' homes and shoot anyone running out of them. (*Id.* at 6-7.) Cox harassed state officials in similar fashion. (*Id.* at 7.)

In August 2010, Cox told attendees at a militia meeting that there was a federal assassination team targeting him and his family. (*Id.*) He also accused the federal government of being behind an Alaska Office of Children's Services investigation of him. (*Id.*) Cox boasted that he had told a state judge in open court, "We don't mean any harm to anyone, but if you want a war, we've got one hell of a war with your name on it." (*Id.*) No such federal assassination team in fact existed, and no government official or government cooperator ever suggested to Cox that one did. (*Id.*)

Still, in November 2010, Cox arranged "security details" to protect him and his family from such an assassination team. (*Id.*) One security detail armed and wearing body armor protected Cox while he attended a state court hearing in Fairbanks on a misdemeanor weapons charge. (*Id.*) Another detail protected him that night while he gave an interview at King Jesus North Pole (KJNP), a television station near Fairbanks. (*Id.* at 7-8.) Cox instructed both details to shoot to kill if a "plainclothes" "agent" "dr[ew] down" on

Cox or one of his cohorts. (*Id.* at 8.) Cox also directed the security details to consider using lead poisoning and grenades against the supposed federal assassins. (*Id.*) In one briefing, Cox told his men that they had to be prepared to kill federal agents and stomp them through the ice. (*Id.*) Cox called the federal agents "soulless assassins" and said, "If we kill one of them, they're not going to be missed, they're not going to come looking for you." (*Id.*)

The KJNP security detail was heavily armed and alert. (*Id.*) Coleman Barney, another of Cox's co-conspirators, wore body armor and carried an AR-15 with a grenade launcher loaded with "Hornet's Nest" anti-personnel rounds attached. (*Id.*) Others were similarly armed. (*Id.*) After setting up lights and a vehicular funnel point, the visibly armed detail stopped at least one car. (*Id.*) Barney watched from the perimeter, while another militia man patrolled the property around KJNP on a four-wheeler. (*Id.*)

A month later, Cox appeared in state court on a weapons charge and claimed that "[s]oulless federal assassins" had threatened his life and his family's lives. (*Id.* at 9.) Cox told the judge that he saw her around town and that "a lot people" preferred to kill her "in [her] home at night" than appear in her courtroom. (*Id.*) A few days after that, Cox and four others surrounded a state trooper; Cox told the trooper, "We've got you guys outmanned and outgunned, and we could probably have you guys all dead in one night." (*Id.*) Throughout this time, Cox told others in his militia to try to obtain more weaponry, including pineapple grenades, C-4 explosives, and silencers. (*Id.*)

By February 2011, Cox began discussing his "2-4-1" plan. (*Id.* at 9.) Cox told others that he would not appear at his next court hearing; instead, he raised the idea of 2-4-1: militia members would kill two government officials for every militia member that the

government killed. (*Id.*) In describing this plan, Cox said that two state court employees "need to dangle together like a windchime." (*Id.*) Cox also clarified that the 2-4-1 plan also applied to arrest, meaning that if one militia member were arrested, the militia should "kick in the judges' door" and "arrest two of them." (*Id.* at 9-10.) Cox continued that he would be "well within [his] rights to go drill McConahy in the forehead" because of the threat posed to his life and the lives of his family. (*Id.* at 10.) McConahy was the state court judge presiding over his pending criminal case. (*Id.*) Cox knew that his militia was too weak to execute the 2-4-1 plan and survive, but he urged others to "work and train and get ready to where we can turn that 241 into a real ability." (*Id.*)

That same month, Cox did not appear for a scheduled court hearing, as he foreshadowed, prompting a warrant for his arrest. (*Id.*) Cox moved into a residence owned by his co-conspirator Lonnie Vernon. (*Id.*) He and Vernon discussed setting booby traps to block law enforcement access to the home. (*Id.*) Cox envisioned he and his cohorts "kill[ing] a whole butt load of them and then offer[ing] peace." (*Id.*)

When he moved to another co-conspirator's house a few days later, Cox brought along grenades, guns, and body armor. (*Id.*) Cox spoke of "roll[ing] judges' heads" and of the 2-4-1 plan, believing that, although his militia was too weak at that time, the 2-4-1 plan could "become[] a real possibility" if the militia used "guerilla warfare." (*Id.* at 10-11.) Cox also said, "Well, I'm not going to target women and children, but I'm not opposed to killing them either, you know." (*Id.* at 11.) And he said that he was not against doing "shocking things" such as "mailing heads to people." (*Id.*) While a fugitive in February

and March 2011, Cox and other militia members continued to acquire weapons and to make additional plans to start the 2-4-1 plan. (*Id.*)

Cox's plans to act accelerated in March 2011. Cox directed Gerald "J.R." Olson—a government cooperator who Cox believed was an active militia member—to obtain the government official database that Anderson had maintained. (*Id.*) Anderson refused to turn it over and decided soon after to destroy the database because he feared what Cox would do with it. (*Id.*) Not knowing that Anderson had destroyed it, Cox and other co-conspirators tried to obtain the database from Anderson throughout early March 2011. (*Id.*)

On March 10, 2011, Cox and other militia members sought to obtain additional weapons. (*Id.* at 12.) For example, militia member Vernon and his wife bought a pistol, silencer, and two hand grenades from Olson. (*Id.*) They were arrested soon after. (*Id.*) Later the same day, Olson drove Cox and Barney to a location where Olson had a pistol, silencer, and grenades for Cox's inspection. (*Id.*) While Cox and Barney—who were wearing body armor and carrying loaded firearms—were examining the weapons, a concerned citizen approached, which in turn led federal authorities to intervene and arrest Cox and Barney. (*Id.*)

In searches of Barney's trailer, residence, and truck, Vernon's vehicle and residence, and Cox's residence, officers seized many firearms (including machine guns and assault rifles), body armor, gas masks, handcuffs, grenades, silencers, and tens of thousands of rounds of ammunition. (*Id.*) Cox's phone included a note entitled "Press Conference" that referred to federal authorities as "trigger happy cowboys" and stated that if the "FBI and

the US martials want a big'Ole blow out I wish you would just call me and put it on the callender." (*Id.* at 12-13.)

**2. Procedural Background**

Cox was indicted with two co-defendants, Coleman Barney and Lonnie Vernon, in a 16-count indictment charging a Conspiracy to Murder Federal Officers and Employees, in violation of 18 U.S.C. §§ 1117 and 1114); Solicitation to Murder a Federal Official, in violation of 18 U.S.C. §§ 373 and 1114; Conspiracy to Possess Unregistered Silencers and Destructive Devices; and other weapons violations. (*Id.* at 13.) The jury found Cox guilty of both the murder conspiracy and the solicitation to murder counts, and several weapons-related counts. (*Id.* at 17.) The district court sentenced Cox to a total of 310 months in prison, including 310 months on the murder conspiracy and 240 months on the solicitation to murder, with all terms running concurrently. (*Id.*) The court also imposed five years' supervised release to follow. (*Id.*)

In his first of his three appeals to the Ninth Circuit, Cox challenged the sufficiency of the evidence underlying both the murder conspiracy (Count 12) and the solicitation to murder (Count 16). (*Id.*) In an unpublished memorandum opinion, the Ninth Circuit panel upheld the sufficiency of the murder conspiracy, concluding that Cox and his coconspirators "agreed to attack government officials—including federal officers—in the event of certain conditions that they subjectively thought were likely to occur." *United States v. Cox*, 705 F. App'x 573, 576 (9th Cir. 2017). But the panel held that the evidence of the solicitation was insufficient. (*Id.* at 20.) Cox's case was remanded for resentencing because of the reversal of the solicitation conviction. (*Id.*) In November 2019,

the district court resentenced Cox to 188 months in prison followed by three years' supervised release. (*Id.* at 24.)

In his second appeal, Cox challenged the district court's reasoning in denying his motion for a writ of *audita querela*. (*Id.* at 23-24.) Cox had argued that the appellate panel's reversing his solicitation conviction "cracked the foundation" of his murder conspiracy conviction. (*Id.* at 23.) But in another unpublished memorandum opinion, the Ninth Circuit affirmed the district court's denial of Cox's motion. *United States v. Cox*, No. 19-30254, 2021 WL 4705233, at *1 (D. Alaska Oct. 8, 2021).

Cox then moved to vacate his murder conspiracy conviction under 28 U.S.C. § 2255, claiming again that the Ninth Circuit's decision in his first appeal undermined that conviction, and arguing that his trial counsel was ineffective. (*Id.* at 26.) The district court denied the motion. (*Id.*) But it issued a certificate of appealability as to whether the Ninth Circuit's holding on the solicitation charge undercut the murder conspiracy; whether Cox's defense counsel was deficient as to distinguishing between federal and state officers; whether counsel was deficient as to the mens rea and unanimity instructions for the conspiracy; and whether there was cumulative deficiency. (*Id.* at 29-30.) In a third unpublished memorandum opinion, the Ninth Circuit upheld the district court's denial of the § 2255 motion. *United States v. Cox*, No. 23-2713, 2024 WL 5001826, at *1-2 (D. Alaska Dec. 6, 2024).

According to the Bureau of Prisons, Cox was released from custody on September 6, 2024. He began his supervision term that day.

//

## 3. Legal Framework

After a defendant has served one year on supervised release, a court may end the supervision term "if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice." 18 U.S.C. § 3583(e)(1); *United States v. Emmett*, 749 F.3d 817 (9th Cir. 2014). In reaching this decision, courts consider the following factors: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) deterrence; (3) protection of the public; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment; (5) the sentence and sentencing range established for the category of the defendant; (6) any pertinent policy statement by the Sentencing Commission; (7) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (8) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

## 4. Argument

This Court should decline to end Cox's supervision term early. The nature and circumstances of Cox's offense and his history and characteristics, the need to deter Cox and others like him, and the need to protect the public all weigh against early termination.

The nature and circumstances of Cox's conduct and his history and characteristics are dangerous and disturbing. Cox and his cohorts were heavily armed, often wore body armor, and sought to intimidate, provoke, and clash with federal and state officials. They kept a hit list with federal officials' names, home addresses, and other identifying information and discussed their need to possibly kill them in the future. Cox referred to

federal officials as Nazis and harassed and confronted them. He threatened that he would burn down TSA agents' homes and shoot anyone running out of them. He told his men that they had to be prepared to kill federal agents and stomp them through the ice. He suggested to a state judge that she might be killed in her home at night. He told a state trooper that they could kill him and his fellow troopers in one night. In describing their 2-4-1 plan, Cox said that two state court employees "need to dangle together like a windchime." He discussed arresting state judges, rolling judges' heads, mailing heads to people, and killing women and children. When he was a fugitive, he sought the hit list, which had been destroyed out of fear that he would have acted on it. And while he was in prison, he and his men continued to think of him as a persecuted person. (Dkt. 748 at 5-11.)

Given their threat to judges, officers, and officials, and to social order, there is a need to deter Cox and his men and others like them. Cox's sentence provides such deterrence. But not requiring Cox to serve it fully undermines that deterrence.

Similarly, there is a need to protect the public. Cox and his men pose a significant risk of violence and disorder. Supervising Cox protects the public by reducing his risk of recidivism, promoting his rehabilitation, and deterring his future criminal conduct. *See United States v. Knights*, 534 U.S. 112, 118-19 (2001). Ending his supervision early puts the public at higher risk.

These factors outweigh Cox's arguments for early termination.

//

//

//

## 5. Conclusion

Cox's conduct and history, the need to deter him and others, and the need to protect the public warrant continuing him on supervision.

RESPECTFULLY SUBMITTED this 13th day of August 2026, in Anchorage, Alaska.

MICHAEL J. HEYMAN
United States Attorney

s/ *Stephen L Corso*
STEPHEN L. CORSO
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I certify that on August 13, 2026, a true and correct copy of the foregoing was served electronically on all counsel of record.

s/ *Stephen L Corso*
Assistant United States Attorney